1

2

3

4

5

6              IN THE UNITED STATES DISTRICT COURT FOR THE

7                    EASTERN DISTRICT OF CALIFORNIA

8

9  C.B., a minor,                    )        No. CV-F-09-285 OWW/DLB
                                      )
10                                    )        MEMORANDUM DECISION AND
                                      )        ORDER GRANTING IN PART WITH
11              Plaintiff,            )        LEAVE TO AMEND, GRANTING IN
                                      )        PART WITHOUT LEAVE TO AMEND,
12         vs.                        )        AND DENYING IN PART
                                      )        DEFENDANTS' MOTIONS TO
13                                    )        DISMISS (Docs. 8 & 15) AND
   SONORA SCHOOL DISTRICT,           )        GRANTING IN PART AND DENYING
14 et al.,                           )        IN PART DEFENDANTS' MOTION
                                      )        TO STRIKE (Doc. 12)
15              Defendants.           )
                                      )
16 _____)

17

18

19         Plaintiff C.B., a minor, has filed a Complaint against

20  Defendants Sonora School District; Karen Sinclair; City of

    Sonora; Chief of Police Mace McIntosh; Officer Hal Prock; and

21  Does 1-10.  As facts common to all causes of action, the

22  Complaint alleges:

23              9) In the 2007-2008 school year, minor C.B.
                was enrolled as a 6th grade student at Sonora
24              Elementary School in the Sonora School
                District.
25
                10) C.B. suffers from disabilities, namely a
26

                                    1

mood disorder and attention deficit
hyperactivity disorder, which qualify him for
the protections of Title VI of the Civil
Rights Act, the Americans with Disabilities
Act, Section 504 of the Rehabilitation Act,
and California's Unruh Civil Rights Act.  At
all times relevant to the Complaint, Sonora
School District knew of C.B.'s disabilities
and had in fact placed C.B. on an
individualized Education Plan and section 504
plan.

11) C.B.'s IEP and section 504 plans at
Sonora Elementary School included specific
behavioral interventions to be followed in
the event C.B. 'shut down' or became
unresponsive to school staff due to his mood
disorder.  Interventions included allowing
C.B. to go to designated 'safe zones,' re-
directing C.B. to a leadership or other task,
and, if all else failed, contacting C.B.'s
parents or other relatives or friends
designated by C.B.'s parents.  Sonora School
District and Sinclair knew at all times
relevant to the complaint that C.B.'s
behavior of 'shutting down' was and is a
symptom of his disabilities.

12) On or about September 29, 2008, C.B.
allegedly experienced episodes in which he
'shut down' and became unresponsive to school
staff.  The staff at Sonora Elementary School
failed to follow C.B.'s IEP and section 504
plan for behavioral intervention and failed
to contact C.B.'s parents or designated
relatives or friends to assist C.B.

13) Due to C.B.'s disabilities and despite
the plans put in place to accommodate those
disabilities, Karen Sinclair, a specialist
employed by Sonora Elementary School,
threatened C.B. that if he did not do as she
instructed, she would call the police.
Sinclair did in fact instruct a school
receptionist to call the City of Sonora
Police Department for intervention with an
out of control juvenile.

14) On or about September 29, 2008, Chief of
Police Mace McIntosh, Officer Hall Prock, and
Officer Bowly responded to Sonora Elementary

2

School to respond to the report of the 'out
of control' juvenile who was allegedly
causing a disturbance at the school.

15) Upon locating C.B. on the school grounds,
the police encountered C.B., an eleven year
old student, who was not acting in any
disruptive or disruly manner but rather
sitting quietly on a bench with his head
down.

16) Despite the fact that C.B. posed no
threat to anyone and despite the fact there
was no probable cause to take C.B. into
custody, Chief of Police Mace McIntosh
directed Officer Hal Prock to handcuff C.B.
The police took C.B. into custody, placing
him handcuffed in a police car, and drove
C.B. to Jamestown, California, leaving C.B.
in the custody of his uncle Mark Banks.

17) Sinclair and the Sonora Elementary School
staff at all times had Mark Banks' contact
information as well as the contact
information of C.B. and other friends and
relatives of C.B., yet at no time did
Sinclair or any staff at Sonora Elementary
School contact these individuals to assist
with C.B. as dictated by common sense as well
as C.B.'s IEP and section 504 plans.
Instead, Sinclair and Sonora School District
treated C.B. harshly and disproportionately,
like a criminal, despite the fact he had done
nothing wrong and had simply displayed
symptoms of a disability which was known to
Defendants.

18) At no time did the referenced City of
Sonora employees have the permission of C.B.
nor his parents to transport C.B. or to cause
C.B. to be transported by anyone other than
C.B.'s parents and emergency contacts.

19) Sonora School District and the City of
Sonora Police Department, in committing the
above acts, caused extreme emotional distress
to Plaintiff including a regression in
progress previously made in treating
Plaintiff's mood disorder and ADHD.
Plaintiff was forced to dis-enroll from
Sonora Elementary School due to the trauma

caused by Defendants' excessive and harsh treatment.  Defendants' actions violated Plaintiff's civil rights.

The Complaint alleges that Plaintiff filed California Tort Claims with the Sonora School District and the City of Sonora and that both claims were rejected.  The Complaint alleges the following causes of action:

1.  First Cause of Action against Sonora School District for violation of Section 51(b), 51.5(a), and 54 of the Unruh Civil Rights Act "by discriminating against Plaintiff on account of his disability and by causing Plaintiff to be forcibly removed from Sonora Elementary School on account of his disability;

2.  Second Cause of Action for false imprisonment against Defendants McIntosh, Prock, and City of Sonora;

3.  Third Cause of Action for battery against Defendants McIntosh, Prock, and City of Sonora;

4.  Fourth Cause of Action for intentional infliction of emotional distress against all Defendants;

5.  Fifth Cause of Action for violation of Section 504 of the Rehabilitation Act against Defendant Sonora School District by discriminating against C.B. "on the basis of his disability ... by threatening C.B. with police involvement and by in fact causing such police intervention solely due to C.B.'s disabilities;

6.  Sixth Cause of Action for violation of Title II of the Americans with Disabilities Act against Defendant Sonora School District by discriminating against C.B. "on the basis of his disability ... by threatening C.B. with police involvement and by in fact causing such police intervention solely due to C.B.'s disabilities;

4

7. Seventh Cause of Action against Defendant
Sinclair in her individual capacity for
violation of 42 U.S.C. § 1983;

8. Eighth Cause of Action for excessive
force in violation of Section 1983 against
Defendants McIntosh and Prock in their
individual capacities;

9. Ninth Cause of Action for *Monell*
liability against Defendant City of Sonora.

The Complaint prays for compensatory, incidental, general and

special, and punitive damages, for civil penalties, and

attorneys' fees.

Defendants Sonora School District and Karen Sinclair

(collectively District Defendants) move to dismiss the Complaint

pursuant to Rules 12(b)(1) and 12(b)(6) on the grounds that (1)

the Court lacks subject matter jurisdiction over Plaintiff's

federal claims because Plaintiff has failed to exhaust

administrative remedies; (2) Plaintiff's state law claims are

barred by Plaintiff's failure to exhaust administrative remedies

pursuant to the California Code of Regulations; (3) federal law

precludes Plaintiff's tort claim against the District Defendants;

(4) Plaintiff's tort claim is barred by California Government

Code § 820.2; (5) the Complaint fails to plead facts stating any

claim for relief; (6) the Complaint fails to plead facts

establishing a *prima facie* case under the Unruh Civil Rights Act;

(7) Plaintiff must elect one remedy under either California Civil

Code §§ 52 or 54.3; (8) the Complaint fails to plead facts

establishing intentional discrimination; (9) the Complaint fails

to plead facts establishing a *prima facie* claim of intentional

1  infliction of emotional distress; (10) the Complaint fails to

2  plead facts establishing *prima facie* claims of violation of § 504

3  of the Rehabilitation Act of 1973, Title II of the Americans with

4  Disabilities Act, or 42 U.S.C. § 1983; and (11) Defendant

5  Sinclair is entitled to qualified immunity from liability.

6  Alternatively, the District Defendants move for a more definite

7  statement.

8       The District Defendants also move pursuant to Rule 12(f) to

9  strike the punitive damages allegations and prayer for punitive

10  damages.

11       Defendants City of Sonora, Chief of Police Mace McIntosh,

12  and Officer Hal Prock (collectively the City Defendants) move to

13  dismiss the Complaint pursuant to Rule 12(b)(6) for failure to

14  state a claim upon which relief can be granted and on the ground

15  of qualified immunity from liability.  Alternatively, the City

16  Defendants move for a more definite statement.

17       A.   <u>GOVERNING STANDARDS</u>.

18            1.   <u>Motion to Dismiss for Lack of Subject Matter</u>

19  <u>Jurisdiction</u>.

20       In the context of IDEA cases, the Ninth Circuit recognizes

21  the requirement of exhaustion of administrative remedies as

22  jurisdictional in nature.  *See Robb v. Bethel Sch.* Dist. # *403*,

23  308 F.3d 1047 (9th Cir.2002), *Dreher v. Amphitheater Unif. Sch.*

24  *Dist.*, 22 F.3d 228, 221 (9th Cir.1994).

25       Federal subject matter jurisdiction must exist at the time

26  an action is commenced.  *See Morongo Band of Mission Indians v.*

6

*California State Board of Equalization*, 858 F.2d 1376, 1380 (9th Cir.1988), *cert. denied*, 488 U.S. 1006 (1989).  Dismissal is appropriate when the district court lacks subject matter jurisdiction over a claim.  Rule 12(b)(1), Federal Rules of Civil Procedure.  Since subject matter jurisdiction is a threshold issue which goes to the power of the court to hear a case, a Rule 12(b)(1) challenge should be decided before other grounds for dismissal, because they will become moot if dismissal for lack of jurisdiction is granted.  *See Alvarez v. Erickson*, 514 F.2d 156, 160 (9th Cir.1975), *cert. denied*, 423 U.S. 874 (1975).

A federal court is presumed to lack subject matter jurisdiction until the contrary affirmatively appears.  *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir.1989).  Although the defendant is the moving party on a motion to dismiss, the plaintiff has the burden of establishing subject matter jurisdiction because plaintiff is the party invoking the court's jurisdiction.  *Id.*  Under a Rule 12(b)(1) motion attacking a complaint on its face, the court must consider the allegations of the complaint as true.  *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3rd Cir.1977).  An action should not be dismissed for lack of subject matter jurisdiction without giving the plaintiff an opportunity to amend unless it is clear that the jurisdictional deficiency cannot be cured by amendment.  *May Dept. Store v. Graphic Process Co.*, 637 F.2d 1211, 1216 (9th Cir.1980).

        2.   <u>Motion to Dismiss for Failure to State a Claim</u>.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint. *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001). Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory. *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984). In reviewing a motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003). "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.*, 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 570 (2007). "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic, id.* at 555. A claim has facial

plausibility when the plaintiff pleads factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged.  *Id.* at 556.  The
plausibility standard is not akin to a "probability requirement,'
but it asks for more than a sheer possibility that a defendant
has acted unlawfully,  *Id.*  Where a complaint pleads facts that
are "merely consistent with" a defendant's liability, it "stops
short of the line between possibility and plausibility of
'entitlement to relief.'" *Id.* at 557.  In *Ashcroft v. Iqbal*, ___
U.S. ___, 129 S.Ct. 1937 (2009), the Supreme Court explained:

> Two working principles underlie our decision
> in *Twombley.*  First, the tenet that a court
> must accept as true all of the allegations
> contained in a complaint is inapplicable to
> legal conclusions.  Threadbare recitations fo
> the elements of a cause of action, supported
> by mere conclusory statements, do not suffice
> ... Rule 8 marks a notable and generous
> departure from the hyper-technical, code-
> pleading regime of a prior era, but it does
> not unlock the doors of discovery for a
> plaintiff armed with nothing more than
> conclusions.  Second, only a complaint that
> states a plausible claim for relief survives
> a motion to dismiss ... Determining whether a
> complaint states a plausible claim for relief
> will ... be a context-specific task that
> requires the reviewing court to draw on its
> judicial experience and common sense ... But
> where the well-pleaded facts do not permit
> the court to infer more than the mere
> possibility of misconduct, the complaint has
> alleged - but it has not 'show[n]' - 'that
> the pleader is entitled to relief.' ....
>
> In keeping with these principles, a court
> considering a motion to dismiss can choose to
> begin by identifying pleadings that, because
> they are no more than conclusions, are not
> entitled to the assumption of truth.  While
> legal conclusions can provide the framework

9

> of a complaint, they must be supported by
> factual allegations.  When there are well-
> pleaded factual allegations, a court should
> assume their veracity and then determine
> whether they plausibly give rise to an
> entitlement to relief.

Immunities and other affirmative defenses may be upheld on a motion to dismiss only when they are established on the face of the complaint.  *See Morley v. Walker*, 175 F.3d 756, 759 (9th Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

3.  <u>Motion for More Definite Statement</u>.

"Under the liberal pleading standards, 'pleadings in federal courts are only required to fairly notify the opposing party of the nature of the claim.'"  *City of South Pasadena v. Slater*, 56 F.Supp.2d 1095, 1105 (C.D. Cal. 1999).  Federal Rule of Civil Procedure 12(e) provides:

> If a pleading to which a responsive pleading
> is permitted is so vague or ambiguous that a
> party cannot reasonably be required to frame
> a responsive pleading, the party may move for
> a more definite statement before interposing
> a responsive pleading.  The motion shall
> point out the defects complained of and the
> details desired.  If the motion is granted
> and the order of the court is not obeyed
> within 10 days after notice of the order or
> within such other time as the court may fix,
> the court may strike the pleading to which

10

the motion was directed or make such order as it deems just.

A Rule 12(e) motion for a more definite statement must be considered in light of Rule 8's liberal pleading standards in federal court. *See, e.g., Bureerong v. Uvawas*, 922 F.Supp 1450, 1461 (C.D. Cal. 1996).

A Rule 12(e) motion is proper only if the complaint is so indefinite that the defendant cannot ascertain the nature of the claim being asserted, *i.e.*, so vague that the defendant cannot begin to frame a response. *See Famolare, Inc. v. Edison Bros. Stores, Inc.*, 525 F.Supp. 940, 949 (E.D. Cal. 1981). The Court must deny the motion if the complaint is specific enough to notify defendant of the substance of the claim being asserted. *See Bureerong*, 922 F.Supp. at 1461; *see also San Bernardino Pub. Employees Ass'n v. Stout*, 946 F.Supp. 790, 804 (C.D. Cal. 1996) ("A motion for a more definite statement is used to attack unintelligibility, not mere lack of detail, and a complaint is sufficient if it is specific enough to apprise the defendant of the substance of the claim asserted against him or her.").

The Court may also deny the motion if the detail sought by a motion for more definite statement is obtainable through discovery. *See Davidson v. Santa Barbara High Sch. Dist.*, 48 F.Supp.2d 1225, 1227 (C.D. Cal. 1998). "Thus, the class of pleadings that are appropriate subjects for a motion under Rule 12(e) is quite small—the pleading must be sufficiently intelligible for the court to be able to make out one or more

potentially viable legal theories on which the claimant might proceed, but it must not be so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself."  Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (2d ed.) §1376.

Whether to grant a Rule 12(e) motion for a more definite statement lies within the wide discretion of the district court. *See id.* §1377.  However, "[m]otions for more definite statement are viewed with disfavor, and are rarely granted."  William W. Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, Federal Civil Procedure Before Trial §9:351 (2000).

4.  <u>Motion to Strike</u>.

Rule 12(f) provides in pertinent part that the Court "may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Motions to strike are disfavored and infrequently granted.  *Neveu v. City of Fresno,* 392 F.Supp.2d 1159, 1170 (E.D.Cal.2005).  A motion to strike should not be granted unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of the litigation.  *Id.*  The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that might arise from litigating spurious issues by dispensing with those issues prior to trial.  *Fantasy, Inc. v. Fogerty,* 984 F.2d 1524, 1527 (9th Cir.1993), *rev'd on other grounds*, 510 U.S. 517 (1994).

B.  <u>District Defendants' Motion to Dismiss</u>.

### 1. Lack of Subject Matter Jurisdiction.

The District Defendants move to dismiss the Fifth Claim for violation of § 504 of the Rehabilitation Act of 1973, the Sixth Claim for violation of Title II of the Americans with Disabilities Act, and the Seventh Claim for violation of Section 1983 for lack of subject matter jurisdiction.

The District Defendants argue that the Complaint alleges that they failed to properly implement Plaintiff's IEP when they contacted the police, regardless of the labels Plaintiff attaches to his claims. The District Defendants contend that Plaintiff cannot sue under any federal law until he completely exhausts administrative remedies under the Individuals with Disabilities Education Act ("IDEA"). District Defendants argue that the Complaint demonstrates on its face that this lawsuit is premised on the claim that the District was not justified in its decision to implement the emergency intervention of contacting the police instead of following the procedures outlined in Plaintiff's IEP.

The IDEA is a comprehensive educational scheme that confers on students with disabilities a substantive right to public education. *See Van Duyn v. Baker Sch. Dist. 5J*, 481 F.3d 770, 776 (9th Cir.2007); *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.3d 1298, 1300 (9th Cir.1992). The IDEA provides financial assistance to enable states to meet their educational needs, but conditions funding on the effectuation of a policy that assures all children with disabilities the right to a free appropriate public education ("FAPE"). 20 U.S.C. § 1412(a)(1). To that end,

the IDEA requires that school districts develop an IEP for each child with a disability.  *See Winkleman ex rel. Winkleman v. Parma City Sch. Dist.*, 550 U.S. 518 (2007).  When a party is dissatisfied with "the adequacy of the education provided, the construction of the IEP, or some related matter," *Winkleman*, *id.* at 525, the IDEA provides a procedural recourse.  Participating states are required to establish procedures giving an opportunity for any party to present a complaint concerning an IEP.  20 U.S.C. § 1415(b)(6)(A).  California has adopted legislation to comply with these procedures.  *See* California Education Code § 56500-56507; 5 California Code of Regulations §§ 3040-3054.  20 U.S.C. § 1415(l) provides:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) of this section shall be exhausted to the same extent was would be required had the action been brought under this subchapter.

The District Defendants argue that a lawsuit alleging discrimination is precluded where administrative remedies have not been exhausted under the IDEA, citing *Kutasi v. Las Virgenes Unified Sch. Dist.*, 494 F.3d 1162 (9th Cir.2007) and *Robb v. Bethel Sch. Dist. #403*, 308 F.3d 1047 (9th Cir.2003).

In *Kutasi*, Shane, an autistic child, attended Round Meadow

14

Elementary School in California, from 1999 until he graduated in 2004.  In 1999, Shane's parents and the School District agreed to an IEP.  In accordance with the 1999 IEP, Shane attended a general education first-grade class with an aide for most of the morning and received home schooling in the afternoon.  The Kutasis and the School District, however, were unable to reach agreement on a modified IEP for Shane for the succeeding school years.  As a result of a "stay put" order issued by the California Special Education Hearing Officer that extended the terms of the 1999 IEP, Shane continued to receive full inclusion in a classroom with a modified curriculum, as well as speech and occupational therapy services.  According to the Complaint, a long history of bitter disagreement between the Kutasis and the School District came to a head in the fall of 2004 after Shane graduated from Round Meadow Elementary School.  Shane was scheduled to attend A.E. Wright Middle School.  But on August 27, 2004, three days before the 2004-2005 school term began, the School District proposed an IEP that required Shane to be placed in a "Special Day Class," created for students with disabilities regardless of their age, grade or specific disability.  The Kutasis rejected the School District's proposal, and the parties continued to differ over the kind of educational and related services to be provided Shane.  Shane briefly attended general education classes at Wright, but was denied access to the school after three days by Principal Rosenweig, who claimed that Shane was not properly enrolled.  Since September 2004, Shane was

schooled at home by a team of behavioral therapists pursuant to the stay put order.  The Kutasis, on their own behalf as well as Shane's, filed a complaint in the District Court, alleging a claim for violation of Section 1983 and a claim for violation of Section 504 of the Rehabilitation Act of 1973.  The Kutasis alleged that the Defendants had "engaged in a pattern and practice of retaliatory and discriminatory actions against Shane and his parents."  The complaint identified 18 alleged "retaliatory and discriminatory actions":

> (1) failing to properly investigate and remedy complaints of non-compliance filed with the United States Department of Education, Office for Civil Rights ("OCR");
>
> (2) interfering with the parents' custodial rights over Shane;
>
> (3) in September 2004, refusing to allow Shane to attend A.E. Wright after he had been assigned classes and had already attended school;
>
> (4) repeatedly refusing to reimburse the Kutasis for Shane's therapy by failing to pay invoices presented pursuant to the stay put order;
>
> (5) on February 9, 2004, singling out and demanding that the Kutasis turn over videotapes of Shane made by Barbara Kutasi at Round Meadow while not requiring this of any other parents;
>
> (6) from September 2000 through May 2004, requiring that the Kutasis sign Shane in and out of school every day when no other student was required to do so;
>
> (7) refusing to allow the Kutasis to visit the Resource Classroom during a tour of A.E. Wright camps while allowing other parents to do so;

(8) on two separate occasions demanding that the Kutasis leave the Special Day Class at A.E. Wright during an observation;

(9) humiliating Barbara Kutasi in front of other students and parents each time she visited Shane at Round Mountain;

(10) repeatedly setting Shane's IEP on the same date and time - but different location - as the Kutasis' other child's IEP;

(11) deliberately setting an IEP on Shane's birthday in August 2003 and August 2004;

(12) refusing to allow the Kutasis to volunteer for field trips that were taken at Round Meadow;

(13) requiring that Barbara Kutasi obtain a TB test and a medical release in order to be a "room parent" volunteer when this "rule" was not enforced against any other parent;

(14) conducting unnecessary and unreasonable surveillance of the Kutasis when they visited Round Meadow;

(15) attempting to obtain Shane's private medical records without the Kutasis' permission and consent;

(16) failing to provide the Kutasis periodic reports of Shane's progress while other parents received such reports;

(17) demanding that another of the Kutasi children personally attend Shane's IEP meeting; and

(18) otherwise punishing and threatening Plaintiffs for having exercised constitutionally and statutorily protected rights.

After the Kutasis filed their complaint in the District Court, but before the District Court issued a ruling, the School District filed an administrative hearing request, asking the SEHO

17

1  to approve the August 2004 proposed IEP.  The School District's
2  request did not refer to any of the discriminatory acts alleged
3  in the Kutasis' complaint.  While the School District's
4  administrative hearing was still pending before the SEHO, the
5  District Court granted the Defendants' motion to dismiss, holding
6  that the Kutasis failed to exhaust the IDEA's administrative
7  remedies before filing suit in federal court.  Recognizing that
8  "[t]he threshold question is whether the injuries alleged could
9  have been redressed to *any degree* by the IDEA's administrative
10 procedures and remedies," the District Court found that "[e]ven a
11 cursory review of Plaintiffs' Complaint makes clear that some of
12 the alleged injuries could almost certainly be redressed by the
13 IDEA's administrative procedures and remedies."  The District
14 Court concluded that, for example, an administrative hearing
15 "could potentially be dispositive, or, at the least, would be
16 helpful to this Court's analysis" of the Kutasis' allegations
17 that the Defendants refused to allow Shane to attend Wright and
18 repeatedly refused to reimburse them for Shane's therapy.  The
19 Kutasis' filed a timely notice of appeal.  After the District
20 Court dismissed the Kutasis' complaint, the SEHO issued a ruling
21 against the School District on the August 2004 proposed IEP,
22 finding that it did not constitute a FAPE in the least
23 restrictive environment.  The SEHO's opinion did not address any
24 of the issues raised by the Kutasis' complaint and the Kutasis'
25 claims still had not been exhausted.  494 F.3d at 1164-1166.
26      The Ninth Circuit affirmed the District Court's dismissal of

the Kutasis' complaint.  First, the Ninth Circuit rejected the parents' argument that they were not required to exhaust IDEA administrative remedies for their claims.  *Id.* at 1167-1168. Second, the Ninth Circuit rejected the argument that exhaustion of IDEA administrative remedies would have been futile because their injuries could not have been redressed to any degree by a due process hearing:

> The Kutasis' also argue that any attempt at exhaustion would have been futile.  'The [IDEA's] exhaustion requirement is not ... a rigid one.'  *Porter v. Bd. of Trustees of Manhattan Beach*, 307 F.3d 1064, 1069 (9th Cir.2002).  Plaintiffs need not seek a due process hearing 'where resort to the administrative process would either be futile or inadequate.'  *Hoeft*, 967 F.2d at 1303. But a party that alleges futility or inadequacy of IDEA administrative procedures bears the burden of proof.  *See Robb*, 308 F.3d at 1050 n.2.
>
> The futility exception derives from the language of the IDEA itself, which limits the exhaustion requirement to cases where the plaintiff 'seek[s] relief that is also available' under the IDEA.  20 U.S.C. § 1415(*l*).  If the plaintiff seeks a remedy for an injury that could not be redressed by the IDEA's administrative procedures, then the claim falls outside § 1415(*l*)'s rubric and exhaustion is unnecessary.  *See Robb*, 308 F.3d at 1050.  On the other hand, if the injury could be redressed 'to any degree' by the IDEA's administrative procedures - or if the IDEA's ability to remedy an injury is unclear - then exhaustion is required.  *See id*.
>
> Our futility analysis is guided by three cases that have addressed the scope of the IDEA's exhaustion requirement.  In *Witte,* 197 F.3d at 1272-73, a student with Tourette's Syndrome filed an action under 42 U.S.C. § 1983, the Rehabilitation Act and the

Americans with Disabilities Act after he was allegedly force-fed oatmeal, strangled and subjected to emotional abuse.  The plaintiff sought money damages, which were not 'available under' the IDEA.  *See id.* at 1275. We concluded that because the plaintiff sought only monetary damages, and because all educational issues had already been resolved to the parties' mutual satisfaction through the IEP process, the plaintiff was not 'seeking relief that is also available' under the IDEA.  *Id.* (quoting 20 U.S.C. § 1415(*l*)).

*Blanchard v. Morton School District*, 420 F.3d 918 (9th Cir.2005), also involved claims for which the IDEA provided no remedy.  The plaintiff in *Blanchard* - the mother of an autistic child - successfully argued that exhaustion of IDEA administrative proceedings was not required because she sought damages for her own emotional distress caused by the defendants' conduct.  Blanchard had represented her son in a series of administrative actions against the defendant school district, resulting in an order compelling the district to implement an IEP and to provide compensatory education to the student to remedy the district's past failings.  *See id.* at 920.  Blanchard's complaint was limited to money damages for her emotional distress due to the defendants' alleged 'deliberate indifference and violation of rights,' as well as reimbursement for wages lost while pursuing her son's remedies under the IDEA.  *Id.* at 920.  Emphasizing that the plaintiff 'had resolved the educational issues implicated by her son's disability and ... obtained the educational relief available under the IDEA on behalf of her son,' we concluded that exhaustion was not required because 'Blanchard's emotional distress injuries and lost income could not be remedied through the educational remedies available under the IDEA.'  *Id.* at 921, 922 (citing *Witte*, 197 F.3d at 1275).  Thus, 'because the IDEA provide[d] *no remedy* for Blanchard,' exhaustion was excused.  *Id.* at 922 (emphasis added).

We circumscribed *Witte*, however, in *Robb v.*

20

*Bethel School District # 403,* where we clarified that a plaintiff cannot evade the IDEA's exhaustion requirement merely by limiting a claim to money damages.  There, a student's parents filed a § 1983 action on behalf of themselves and their daughter after the student was removed from her classroom and tutored by junior high and high school students.  308 F.3d at 1048.  The plaintiffs requested money damages as compensation for 'lost educational opportunities' and 'emotional distress, humiliation, embarrassment, and psychological injury.' *Id.*  Even though an administrative proceeding could not provide relief in the form requested by the plaintiffs, we concluded '[i]t would be inappropriate for a federal court to short-circuit the local school district's administrative process based on the possibility that some residue of the harm Ms. Robb allegedly suffered may not be fully remedied by the services Congress specified in the IDEA.  We are not ready to say that money is the only balm.'  *Id.* at 1050.  *Robb* distinguished *Witte* on three grounds: (1) the *Robb* plaintiffs had not 'taken full advantage of the IDEA administrative process to secure the remedies available thereunder'; (2) they did not allege physical injury; and (3) they requested money damages for 'psychological and educational injuries the IDEA may remedy.'  *Id.* at 1052.

We conclude that the present case is controlled by *Robb* because, unlike the plaintiffs in *Witte* and *Blanchard*, the Kutasis have not resolved all educational issues underlying their claims.  *See Witte,* 197 F.3d at 1275; *Blanchard*, 420 F.3d at 921-22.  That much is obvious from the Kutasis' request for damages to remedy the Defendants' refusal 'to allow Shane to attend A.E. Wright after he had been assigned classes and had already attended school.'  The School District's refusal to allow Shane to attend school is precisely the kind of educational injury that we expect plaintiffs to adjudicate at the administrative stage before seeking relief from a court of law.  *See Hacienda La Puente Unified Sch. Dist. of Los Angeles v. Honig*, 976 F.2d 487, 489 (9th

21

Cir.1992)(upholding SEHO decision ordering student's reinstatement at school); *see also Demers v. Leominster Sch. Dep't,* 96 F.Supp.2d 55, 58 (D.Mass.2000)(requiring that plaintiff seeking order directing school district to reinstate student in regular class program exhaust IDEA's administrative remedies).

In the same vein, the Kutasis complain about injuries resulting from the Defendants' decision to schedule Shane's IEP conference for the same date and time as their other child's IEP conference and from the Defendants' failure to provide educational reports on Shane's progress.  The Kutasis have not explained why these allegedly hostile bureaucratic acts could not have been remedied by the SEHO simply mandating periodic reports and appropriate meeting times in the future.  *See Radcliffe v. Sch. Bd. of Hillsborough County*, 38 F.Supp.2d 994, 1000 (M.D.Fla.1999)(requiring exhaustion of plaintiffs' request for an injunction requiring the school district to hold an IEP meeting at a specific time).  Although such a remedy from the SEHO would not provide the specific form of relief the Kutasis seek – money damages – if could alleviate the root cause of their injury.  'For purposes of exhaustion, "relief that is also available under" the IDEA does not necessarily mean relief that fully satisfies the aggrieved party.  Rather, it means "relief suitable to remedy the wrong done the plaintiff, which may not always be relief in the precise form the plaintiff prefers."' *Blanchard*, 420 F.3d at 923 (quoting *Robb*, 308 F.3d at 1049).

The Kutasis' complaint also alleges that the Defendants have not adequately reimbursed them for Shane's at home therapy provided pursuant to the stay put order.  Once again, the Kutasis fail to bear their burden of proving that resort to the IDEA's administrative procedures would be futile.  The SEHO has authority to order reimbursement for therapy expenditures.  *See Glendale Unified Sch. Dist. v. Almasi*, 122 F.Supp.2d 1093, 1104 (C.D.Cal.2001)(upholding SEHO order mandating reimbursement for occupational therapy); *see also Zasslow v.*

22

> *Menlo Park City Sch. Dist.*, 2001 WL 1488617,
> *4 (N.D.Cal.2001)(reviewing order mandating
> reimbursement for speech and language
> therapy).  Indeed, the Kutasis have
> themselves received such redress from an IDEA
> due process hearing in the past.  Their
> notice of related cases submitted to the
> district court included a copy of a state
> court complaint the Kutasis filed in 2005,
> seeking $62,000 in damages.  The state court
> complaint alleged that on October 13, 2000,
> the SEHO issued a stay put order requiring
> the Las Virgenes Unified School District
> 'reimburse [John and Barbara Kutasi] for
> applied behavioral therapy services' pursuant
> to an agreement between the parties.  Taking
> the Kutasis' allegations as true - and we
> have no reason to doubt the accuracy - we
> must conclude that SEHO could again order the
> School District to reimburse the Kutasis for
> all outstanding invoices.
>
> Because the Kutasis allege injuries that
> could be redressed to some degree by the
> IDEA's administrative procedures and
> remedies, the district court's dismissal fo
> their complaint without prejudice is
> AFFIRMED.

494 F.3d at 1168-1170.

The District Defendants also refer the Court to *Fliess v. Washoe County School District*, 2004 WL 363364 (9th Cir.2004).  In so doing, the District Defendants note:

> Although this decision is unpublished, Ninth
> Circuit Rule 36-3 does not bar a district
> court from considering the unpublished
> decisions of other federal district courts;
> however, such decisions are not binding and
> are considered persuasive authority.

The District Defendants cite *In re Van Wagoner Funds Inc. Securities Litigation*, 322 F.Supp.2d 1173, 1182 n. 5 (N.D.Cal.2004):

> Although this decision is unpublished and out

23

of circuit, Ninth Circuit Rule 36-3 does not bar a district court from considering the unpublished decisions of other federal district courts; however such decisions are not binding and are at most persuasive authority. *Herring v. Teradyne, Inc.*, 256 F.Supp.2d 1118, 1128 n. 2 (S.D.Cal.2002); see also, *Alvarenga-Villalobos v. Reno*, 133 F.Supp.2d 1164, 1167 (N.D.Cal.2000)(holding a district court may cite an out of circuit unpublished decision and not run afoul of the Ninth Circuit Rule 36-3).

Plaintiff argues that the District Defendants have violated Ninth Circuit Rule 36-3 by citing *Fliess* and that this violation warrants dismissal of the District Defendants' motion due to prejudice to Plaintiff.  Ninth Circuit Rule 36-3 provides:

(a) Not Precedent.  Unpublished decisions and orders of the Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion.

(b) Citation of Unpublished Dispositions and Orders issued on or after January 1, 2007. Unpublished dispositions and orders of this Court issued on or after January 1, 2007 may be cited to the courts of this circuit in accordance with Fed. R. Civ. P. 32.1

(c) Citation of Unpublished Dispositions and Orders Issued before January 1, 2007. Unpublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of this circuit, except in the following circumstances.

(i) They may be cited to this Court or to or by any other court in this circuit when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion.

(ii) They may be cited to this Court or by any other court in this circuit for factual purposes, such as to show double jeopardy, sanctionable conduct, notice,

24

>entitlement to attorneys' fees, or the
>existence of a related case.

>(iii) They may be cited to this
>Court in a request to publish a disposition
>or order made pursuant to 9th Cir. R. 36-4,
>or in a petition for panel rehearing or
>rehearing en banc, in order to demonstrate
>the existence of a conflict among opinions,
>dispositions, or orders.

Plaintiff cites *Sorchini v. City of Covina*, 250 F.3d 706, 708-709

(9th Cir.2001):

>The rule does not permit the citation of an
>unpublished disposition for the purpose of
>providing 'notice' to the court of the
>existence or absence of legal precedent.  If
>precedent were a 'fact' for purposes of the
>exception, then the exception would swallow
>up the rule.  It would permit an argument
>such as this: 'I am not citing this
>unpublished disposition as precedent, but
>only to inform the court of the fact that a
>prior panel held precisely what I would like
>the court to hold in my case.'  Obviously,
>this is not what the exception was meant to
>permit.

>Whether or not Sorchini was entitled to the
>instruction he had requested depends on the
>state of our case law, namely whether it was
>clearly established that police were required
>to give a warning before releasing a dog ...
>To determine whether the law was clear, we
>must examine the relevant precedents.
>Because *Kish* is not precedent, neither *Kish's*
>holding, nor *Kish's* observations about the
>state of the law, have any bearing on this
>inquiry.  The only way *Kish* could help
>counsel's argument is prohibited by Ninth
>Circuit rule 36-3 - by persuading us to rule
>in the City's favor because an earlier panel
>had ruled the same way.  Unpublished
>dispositions are neither persuasive nor
>controlling authority, and the limited
>exceptions to the noncitation rule contained
>in section (b) are not intended to change
>that.

25

1      Here, the Ninth Circuit's unpublished opinion in *Fliess* was

2  issued in 2004.  No showing is made by the District Defendants

3  that any of the exceptions set forth in Rule 36-3(c) apply.

4      The District Defendants assert that they "explicitly cited

5  *Fliess* as a decision by the District Court of Nevada where a

6  motion to dismiss was granted under facts that are virtually

7  identical to the facts of the present case."

8      However, the District Defendants did not provide a copy of

9  the District of Nevada's ruling; they provided a citation to and

10  copy of the Ninth Circuit's unpublished opinion affirming the

11  District Court's dismissal.  This is not in accordance with the

12  rules.

13      The District Defendants then argue that "it is not clear

14  that the Ninth Circuit *Court of Appeals* Local Rules apply to

15  govern what cases may be cited to a *District Court* as persuasive

16  authority."  In so arguing, the District Defendants construe the

17  language in Rule 36-3, "may not be cited to the courts of this

18  circuit," to mean that the rule only applies to citations to the

19  various Courts of Appeals.  District Defendants refer to Rule

20  47(a)(1), Federal Rules of Appellate Procedure:

21              Each court of appeals acting by a majority of
            its judges in regular active service may,
22              after giving appropriate public notice and
            opportunity for comment, make and amend rules
23              *governing its practice* ....

24  [Emphasis added].  District Defendants contend that Rule 47(a)(1)

25  does not grant the individual Circuit Courts authority to make

26  rules governing the District Courts' practice.  District

Defendants refer to Rule 83(a)(1), Federal Rules of Civil Procedure:

> After giving public notice and an opportunity for comment, a district court, acting by a majority of its district judges, may adopt and amend rules governing its practice. A local rule must be consistent with - but not duplicate - federal statutes and rules adopted under 28 U.S.C. §§ 2072 and 2075 ....

District Defendants assert that there is no requirement in Rule 83(a)(1) that the District Courts follow the local rules of the Ninth Circuit. District Defendants refer to Rule 5-133(i), Local Rules of Practice for the Eastern District:

> ... If case, statutory, or regulatory authority is relied upon that has not been reported, published, or codified in any [of the listed official reporters], a copy of that authority shall be appended to the brief or other document in which the authority is cited. This requirement shall include, but not be limited to, the Statutes at Large, the Public Laws of the United States, the California Administrative Code, administrative regulations not contained in the Code of Federal Regulations or the Federal Register, and decisions and other matters published in specialized reporter services.

District Defendants contend that they complied with Rule 5-133(i) because they attached a copy of the *Fliess* opinion to their brief. Finally, District Defendants argue that *Sorchini* is distinguishable because *Sorchini* contains no holding as to the power of the District Courts to consider unpublished opinions for their persuasive effect.

District Defendants' construction and interpretation of Rule 36-3 is without merit. This Court has held that Rule 36-3

27

1  prohibits citation to unpublished decisions of the Ninth Circuit

2  which do not satisfy the exceptions stated in the rule or which

3  were issued before January 1, 2007.  *See Brown v. County of Kern*,

4  2008 WL 544565 at * 12 n.6 (E.D.Cal.2008).   However, District

5  Defendants' citation to the Ninth Circuit opinion affirming the

6  District Court's dismissal in *Fliess* does not warrant the

7  sanction requested by Plaintiff, i.e., that District Defendants'

8  motion to dismiss be denied on this ground alone.  The Ninth

9  Circuit's *Fliess* opinion does not apply.

10       However, the parties were advised by Order filed on June 24,

11  2009, that judicial notice is taken of the Order granting

12  Defendants' motion to dismiss filed on December 23, 2002 in

13  *Fliess v. Washoe County*, *et al.*, No. CV-N-02-0011-LRH(RAM),

14  United States District Court for the District of Nevada.  The

15  Court may take judicial notice of matters of public record,

16  including duly recorded documents, and court records available to

17  the public through the PACER system via the internet.  *See* Fed.

18  R. Evid. Rule 201(b); *United States v. Howard*, 381 F.3d 873, 876,

19  fn.1 (9th Cir. 2004).  Ninth Circuit Rule 36-3 does not prohibit

20  citation to or reliance on unpublished District Court decisions,

21  which are, like published District Court opinions, only

22  persuasive authority.  *San Luis & Delta-Mendota Water Authority*

23  *v. Salazar*, 2009 WL 1575169 at *18 n.8 (E.D.Cal.2009); *In re Van*

24  *Wagoner Funds Inc. Securities Litigation*, 322 F.Supp.2d 1173,

25  1182 n.5 (N.D.Cal.2004).

26       In *Fliess*, the Nevada District Court granted the defendants'

28

motion to dismiss for lack of subject matter jurisdiction.   The
plaintiff was a minor child who suffered a number of disabilities
and attended public school in Washoe County, Nevada.   Plaintiff
brought his action under the IDEA.   The District Court ruled:

I.   Background

...

In the instant case, the Plaintiff's IEP
apparently included an instant reward system
for appropriate behavior and for a 'quiet
room to be used as appropriate and physical
restraint to b [sic] used As [sic]
appropriate pursuant to A.B. 280.'
(Complaint at 2 ¶ 7).  Plaintiff alleges that
his teacher and the WCSD did not adhere to
this IEP.  Specifically, Plaintiff alleges
that on September 15, 2002, he was handcuffed
by WCSD School Police and placed in a school
district police car.

Plaintiff claims to have suffered severe
emotional distress as a result of being
handcuffed and placed in the police car and
he now seeks $50,000.00 in compensatory
damages and $150,000.00 in punitive damages.
Notably, Plaintiff does not seek any
equitable relief.

...

III.   Discussion

Plaintiff's complaint alleges that the WCSD
did not adhere to the IEP that was
specifically designed to appropriately deal
with the Plaintiff's behavior problems.   This
allegation apparently relates to two distinct
incidents.   The first incident stemmed from
Plaintiff misbehaving on a school field trip.
As a result of his misbehavior, Plaintiff was
allegedly handcuffed and placed in a WCSD
police car.

The second incident stemmed from the
Plaintiff hitting his teacher, who then
summoned the WCSD Police.   The Police

allegedly issued the Plaintiff a citation and asked him to sign it.  Plaintiff claims that these acts were 'in violation of the I.E.P. in that the Defendants ... failed to follow the mandates of the I.E.P. and the recommendations for discipline contained therein.'  Plaintiff alleges to have suffered severe emotional distress as a result of these incidents and has brought the instant action to redress his alleged injuries.

The IDEA confers on disabled children and their parents the right to have complaints related to the disabled child's IEP resolved before an impartial hearing officer, under the auspices of the relevant state or local educational agency, and in connection with the 'identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child.'  20 U.S.C. § 1415(b)(1).  The IDEA permits parties which are dissatisfied with the outcome of the administrative process to 'bring a civil action with respect to the complaint presented [to the agency],' either in state court or in federal district court.  20 U.S.C. § 1415(i)(2)(A).

However, judicial review under the IDEA is ordinarily available only after a plaintiff has exhausted administrative remedies.  20 U.S.C. § 1415(e)(2).  If a plaintiff is required to exhaust administrative remedies, but fails to do so, federal courts are without jurisdiction to hear the plaintiff's claim.  See Dreher, 22 F.3d at 231.  In the instant case, there is no evidence that Plaintiff has sought redress of the alleged violations of his IEP through the administrative process.  In fact, Plaintiff argues that he is not required to do so.

Plaintiff seeks only monetary damages in this action and '[a]lthough the IDEA allows courts to grant "such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(B)(iii), ordinarily monetary damages are not available under that statute.'  Witte, 197 F.2d at 1275.  Plaintiff argues that the Ninth Circuit's

30

decision in <u>Witte v. Clark County School District</u>, controls this case.  Plaintiff further argues that <u>Witte</u> stands for the proposition that because monetary damages are unavailable under the IDEA, plaintiffs who seek solely monetary damages are not required to exhaust administrative remedies prior to filing an action in federal court.  Additionally, Plaintiff argues that the facts of <u>Witte</u> 'mirror[] precisely the facts of the Plaintiff's case.'  Thus, according to Plaintiff he was not required to exhaust administrative remedies prior to filing this action.

In support of his claim that he need not exhaust administrative remedies, Plaintiff cites the following passage from <u>Witte</u>: 'Because [the] Plaintiff seeks only monetary damages, which is not relief that is available under the IDEA, and because all educational issues have already been resolved to the parties' mutual satisfaction through the IEP process, Plaintiff is not seeking relief that is available under the IDEA. That being so, under the plain words of the statute, exhaustion of administrative remedies is not required.'  <u>Witte</u>, 197 F.3d at 1275 (internal citations and quotations omitted).

Plaintiff's reliance on <u>Witte</u> is, however, misplaced.  Moreover, the Plaintiff's argument is wholly unsupported by the record. Indeed, the instant case is significantly different from <u>Witte</u>.  'Before filing suit, the plaintiff in <u>Witte</u> already had agreed with the defendant school district - through informal processes available under the IDEA or through its formal procedures - to new educational plans and services that would address the educational component of his injuries.'  <u>Robb v. Bethel School District # 403</u>, 308 F.3d 1047, 1051-52 (9th Cir.2002)(discussing why the plaintiff in <u>Witte</u> was permitted to seek monetary damages).  Unlike <u>Witte</u>, all of the educational issues have 'not' been resolved to the parties' mutual satisfaction through the IDEA processes in this case.  Indeed, there is no evidence or even suggestion that

31

the Plaintiff pursued his administrative remedies, not to mention exhausted them.

Plaintiff's argument that the language in Witte suggests he may avoid the IDEA's exhaustion requirement merely by limiting the relief sought to monetary damages is misguided and expressly contradicted by Ninth Circuit precedent.  In the recent case of Robb v. Bethel School District # 403, the Ninth Circuit clearly noted that to read Witte as permission to opt out of the IDEA simply by making a demand for money or services the IDEA does not provide, would be to read Witte out of context.  Robb, 308 F.3d at 1051.  Plaintiff has done exactly that.

The Robb court clarified the correct standard as follows:

> [The] primary concern in determining whether a plaintiff must use the IDEA's administrative procedure relates to the source and nature of the alleged injuries for which he or she seeks a remedy, not the specific remedy requested.  The dispositive question generally is whether the plaintiff has alleged injuries that could be redressed to any degree by the IDEA's administrative procedures and remedies.  If so, exhaustion of those remedies is required.  If not, the claim necessarily falls outside the IDEA's scope, and exhaustion is unnecessary.  Where the IDEA's ability to remedy a particular injury is unclear, exhaustion should be required to give educational agencies an initial opportunity to ascertain and alleviate the alleged problem.

Id. at 1050 ....

In the instant case, Plaintiff admits to behavioral problems and to hitting his teacher.  The teacher and the police allegedly reacted to Plaintiff's various incidents of misbehavior in ways outside of

the Plaintiff's IEP, i.e., by handcuffing him, placing him in a police car, and giving him a citation.  Plaintiff alleges that these reactions were violations of his IEP, which comprised the mutually agreed upon procedures for dealing with such behavioral problems.  Assuming, as the Court is required to do here, that these allegations are true, they are clearly illustrative of the type of educational issues that could and should be redressed through the IDEA's administrative procedures and remedies.

Accordingly, the fact that the Plaintiff seeks solely monetary damages does not confer this Court with subject matter jurisdiction over this case.  The answer to the dispositive question in this case is that the Plaintiff has alleged injuries that could be redressed, to a large degree, by the IDEA's administrative procedures and remedies.  The Ninth Circuit in <u>Robb</u> noted that 'the exhaustion requirement embodies the notion that educational agencies, not the courts, ought to have primary responsibility for the educational programs that Congress has charged them to administer.'  <u>Id</u>. at 1051.

In sum, Plaintiff has remedies available to him through the administrative process.  Until Plaintiff submits to such, this Court does not have subject matter jurisdiction.  Finally, Plaintiff has also alleged a supplementary claim for relief based on negligent supervision.  The Court does not have jurisdiction over this pendent non-IDEA claim and will dismiss it for that reason.

Plaintiff argues that he was not required to exhaust administrative remedies under the IDEA because his lawsuit does not pertain to any matters that could be resolved under the IDEA. Plaintiff asserts that he resolved all educational issues with the School District prior to filing this Complaint and does not seek any remedies like those sought in *Kutasi*.  Plaintiff submits the declaration of Plaintiff's counsel, Christine Hopkins,

33

wherein she avers that Plaintiff can truthfully amend his
Complaint "to state that following the September 29, 2008
incident, the school district initially denied Plaintiff's
request for independent study as a temporary placement but the
Plaintiff's parents and district then came to an agreement for a
temporary independent study placement through October 17, 2008;"
"that [C.B.'s] parents received a letter dated October 31, 2008,
from Sonora School District Superintendent Marguerite Bulkin
stating the following (with Plaintiff's name redacted to state
[C.B.]): 'At the October 29, 2008 meeting of the Sonora School
District Governing Board, the Board voted to accept your request
to revoke the interdistrict Attendance Agreement for your son
[C.B.], effective October 20, 2008 ... According to Gold Rush
Charter School, [C.B.] enrolled in their program on October 28,
2008;" and that C.B. "and his parents worked administratively
with Sonora School District since 2005 to obtain services under
the IDEA and section 504 of the Rehabilitation [Act], including
but not limited to (a) evaluation of his disabilities, (b)
approval of an inter-district transfer agreement to prevent an
attempt by Sonora School District to remove Plaintiff from the
School District based on residency issues (despite the attendance
of Plaintiff and his siblings at Sonora Elementary School for
many years) and (c) implementation and approval of his section
504 behavioral accommodation plan."  Plaintiff argues that these
proposed amendments will establish that Plaintiff did exhaust all
his administrative remedies prior to bringing  this lawsuit

because he agreed to a post-incident placement and has worked
with the School District since 2005 to achieve accommodations.

At the hearing, District Defendants argued that amendment to
include these allegations will not satisfy the administrative
exhaustion requirements.  District Defendants contend that
informal discussions and resolution with the School District do
not suffice to comply with the IDEA's statutory exhaustion
requirements, citing *S.M. V. West Contra Costa County Unified*
*School District Financing Corp.*, 2009 WL 1033826 (N.D.Cal.2009),
and *Hayden C. v. Western Placer Unified School District*, 2009 WL
1325945 (E.D.Cal.2009).

In *S.M.*, Plaintiff, a student with a learning disability,
filed suit in 2006 against the school district and others
alleging that he had been physically and verbally abused by other
students and staff, and that, instead of addressing the abusive
behavior, the school district shifted him to a campus for
students with learning disabilities where the abuse continued.
Plaintiff alleged, among others, claims under the IDEA.  The
District Court dismissed that case in 2007 for failure to exhaust
administrative remedies.  Shortly before the 2007 dismissal,
Plaintiff and his mother filed a request for due process with the
school district's Office of Administrative Hearings (OAH).  On
March 7, 2007, the school district, Plaintiff and his mother
resolved the OAH proceedings by entering into a "Final Mediation
Agreement," which contained a General Release and Discharge.  In
November 2007, Plaintiff and his mother filed the case at issue

based on many of the same events in the original 2006 case, asserting claims under the Constitution and federal statutes, as well as under California statutory and common law.  After finding that Plaintiff's claims, other than tort claims, arising from conduct that occurred prior to March 7, 2007, were barred by the Final Mediation Agreement, the District Court addressed Plaintiff's claims based on events subsequent to March 7, 2007. The District Court dismissed those claims because of Plaintiff's failure to exhaust the IDEA's administrative remedies.

In *Hayden C.*, the Plaintiff's parents originally filed for a due process hearing on July 15, 2008, alleging IDEA violations with regard to the educational services Plaintiff was receiving. That administrative complaint was presented to the Office of Administrative Hearings in accordance with the provisions of the IDEA.  Plaintiff subsequently withdrew her action pursuant to a Settlement Agreement executed by the parties, which detailed educational programs and services to be provided to Plaintiff. After the settlement was reached, Plaintiff's parents complained about the way the educational services contemplated by the settlement agreement were being implemented.  In December 2008, Plaintiff filed the instant action, asking the District Court to enforce alleged breaches of the settlement agreement and asserting causes of action pursuant to the IDEA arising out of the school district's alleged failure to adhere to the provisions of the settlement agreement.  Plaintiff did not institute administrative proceedings concerning the issues raised in the

complaint before filing suit.  The school district moved to dismiss for lack of jurisdiction based on Plaintiff's failure to exhaust administrative remedies.  The District Court dismissed the action on this ground.  The District Court, citing *Pedraza v. Alameda Unified School District*, 2007 WL 949603 (N.D.Cal.2007) and *Weber v. Cranston Sch. Comm.*, 212 F.3d 41,53 (1st Cir.2000), ruled that the IDEA's exhaustion requirement is not satisfied when parties enter into a mediated settlement agreement.  The District Court rejected Plaintiff's argument that *Pedraza* was distinguishable because it was decided prior to 2005 enactment of 20 U.S.C. § 1415(e), making settlement agreements judicially enforceable:

> Plaintiff's attempt to distinguish *Pedraza* in this regard is also misplaced.  Whether or not there is federal jurisdiction to enforce the terms of the settlement does not necessarily dispense with the requirement that administrative remedies be exhausted before the parties seek judicial intervention to resolve their differences.  Instead, even under the 2005 amendments to 20 U.S.C. § 1415, if enforcement of a settlement agreement requires a determination of whether the alleged breach relates to a student's receipt of a FAPE, administrative exhaustion is still required before judicial remedies can be made available.  *See R.K. v. Hayward Unified Sch. Dist.,* [2007 WL 2778702 (N.D.Cal.2007)] ... In *R.K.,* like the present case, the plaintiff's due process hearing request was withdrawn before any hearing was actually conducted.  In ruling on plaintiff's request that the court enforce the terms of the settlement agreement, the *R.K.* court held that administrative remedies were not exhausted since the terms of the settlement implicated provisions of the IDEA that should first be adjudicated at an agency level.

1  *Id.* at *4.

2      In *Pedraza v. Alameda Unified School District, supra*, 2007
3  WL 949603, Plaintiff, who was diagnosed with autism, participated
4  in an IEP meeting at which time the school district outlined its
5  proposal for Plaintiff's FAPE.  Plaintiff disagreed with the
6  proposal and requested a second IEP meeting.  Plaintiffs retained
7  counsel and initiated a due process proceeding to resolve issues
8  relating to the school district's proposed FAPE.  Before the due
9  process hearing took place, Plaintiff and the school district
10 agreed to mediate and subsequently entered into a compromise and
11 release agreement purporting to resolve the issues raised in the
12 due process complaint.  Soon after the school year commenced, the
13 school district breached the settlement agreement.  Plaintiff
14 filed a complaint with the California Department of Education
15 (CDE) setting forth the school district's alleged failure to
16 fulfill its obligations under the settlement agreement and the
17 IDEA.  The CDE issued a report finding that the school district
18 was in compliance with the terms of the settlement agreement.
19 Plaintiff requested reconsideration.  The CDE granted their
20 request, finding that the school district was out of compliance
21 with the terms of the settlement agreement and directed the
22 school district to arrange an IEP meeting to evaluate Plaintiff's
23 program.  The CDE found that, if dispute resolution and/or
24 mediation did not result in a settlement agreement and
25 appropriate program for Plaintiff, the school district shall
26 insure FAPE by initiating a due process proceeding.  No

settlement agreement was reached and the school district failed
to initiate a due process proceeding as required by the CDE.
Plaintiff notified the CDE of the school district's
noncompliance, but the CDE responded that all required corrective
actions have been noted and that the case was closed.  Plaintiff
then initiated a second due process hearing, alleging that the
school district had denied Plaintiff a FAPE by failing to abide
by the settlement agreement.  The OAH dismissed the claim for
lack of jurisdiction because violations of mediated settlement
agreements are within the purview of the CDE.  Plaintiffs then
filed suit in the district court.  The district court ruled:

> The Ninth Circuit has not yet addressed
> whether the IDEA's exhaustion requirement is
> satisfied when parties enter into a mediated
> settlement agreement.  The First Circuit,
> however, has addressed the issue of what
> constitutes exhaustion under the IDEA and
> found that mediation is insufficient.  *Weber
> v. Cranston School Committee*, 212 F.3d 41, 53
> (1st Cir.2000); accord *Tyler B. v. San
> Antonio School Elementary School District*,
> 253 F.Supp.2d 1111, 1118 (N.D.Cal.2003); see
> also James R. Cohen and Peter N. Thompson*,
> Disputing Irony: A Systematic Look at
> Litigation about Mediation*, 11 Harv. Negot L.
> Rev 43, 131 (2006).  In the absence of Ninth
> Circuit precedent, the court adopts the First
> Circuit's interpretation of the IDEA's
> exhaustion requirement and finds that this
> requirement is *not* satisfied when parties
> enter into a mediated settlement agreement.
> Pursuant to the both the IDEA and California
> state law, there must be, at the very least,
> a state-level impartial due process hearing
> before the aggrieved party can file a civil
> action in federal court.  See 20 USC §
> 1415(i)(2); Cal.Educ.Code §56501.
>
> Here, the parties agreed to waive the due
> process hearing and instead, utilized the

> IDEA's mediation process ... While plaintiffs
> ultimately appealed to the CDE, they did so
> based on denial of FAPE under the 2003
> mediated settlement agreement, not based on
> the findings of a due process hearing officer
> ... Because plaintiffs agreed to mediation
> and did not participate in a due process
> hearing, plaintiffs have not exhausted their
> administrative remedies under the IDEA.

*Id.* at *5.  The *Pedraza* Court ultimately ruled that exhaustion of administrative remedies would be futile and denied dismissal for lack of subject matter jurisdiction.

In *Tyler B.*, *supra*, 253 F.Supp.2d 1111, the school district adopted an IEP for Plaintiff, who was legally blind and suffered from acute adrenal insufficiency.  Plaintiff's parents were dissatisfied with the IEP because it did not address providing Plaintiff with health related services in the event of an adrenal crisis episode.  After complaining to school district officials, Plaintiff's parents and grandmother filed complaints with the CDE.  The CDE investigated and issued two reports finding that the school district was not in compliance with its duties and obligations.  Plaintiff alleged that, in response to the CDE reports, the school district retaliated against him by forbidding all teachers and district personnel to administer an emergency adrenal injection, should Plaintiff need one.  Because the district refused to implement a medical emergency plan, Plaintiff's parents removed him from school.  In the ensuing weeks, the district agreed to implement a medical emergency plan, and Plaintiff returned to school.  After Plaintiff's return, his parents continued to complain that Plaintiff was not receiving

appropriate special education services and, in what his parents viewed as the district's continued refusal to remedy the deficiencies noted in the CDE's reports, Plaintiff was removed from the school and schooled at home for the next three years. In 1999, Plaintiff and his parents filed a "Claim against Public Entity" with the Governing Board of the school district, seeking damages for violation of civil rights for refusing to implement an IEP and for retaliation when they asserted their federal and state rights.  The Board denied the claim.  Plaintiff and his parents then filed suit for violations of the Rehabilitation Act, the ADA, the Unruh Act and Section 1983 in state court. Approximately a year and a half later, Tyler B. and his parents filed a complaint in the United States District Court, alleging claims for violation of Section 1983, Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the Unruh Act.  Shortly before the state court action was to be tried, Plaintiffs voluntarily dismissed the state court action. The District Court ruled on summary judgment that Tyler B. was not required to exhaust his administrative remedies under the IDEA prior to filing his claims for relief.  Defendants filed a motion for reconsideration.  Tyler B. argued that exhaustion was not required because the remedy he sought is money damages for civil rights violations and not educational benefits under the IDEA and that he had satisfied the exhaustion requirement of the IDEA through the complaint his parents filed with the Department of Education in 1998.  The District Court ruled that Tyler B. had

not satisfied the exhaustion requirements of the IDEA:

> Based on this record, it is clear that Plaintiff never received a due process hearing.  The record shows that the parents agreed to vacate the due process hearing and pursue mediation.  The record also shows that, following the mediation process, Tyler B. and his parents sought compensation for their alleged injuries through the court system ... It is undisputed that a due process hearing was not held.

*Id.* at 1117.  Plaintiff, relying on *Porter v. Board of Trustees of Manhattan Beach,* 307 F.3d 1064 (9th Cir.2002), argued that, although his compliance complaints did not result in the culmination of a due process hearing, he should be deemed to have exhausted the administrative process required under the IDEA since he initiated review at the state level which fulfilled the essential purposes of the IDEA administrative process.  *Id.*  The District Court rejected Plaintiff's argument:

> The *Porter* case does not support Tyler B.'s argument.  Tyler B.'s case is in a very different procedural posture than the *Porter* case.  As noted, in *Porter*, a due process hearing was concluded and a final order was issued by the hearing officer on the child's behalf, which is required by 20 U.S.C. § 1415.  In Tyler B.'s case, although due process hearings were scheduled, by agreements of the parties they were cancelled.  The initiation of a state level review which did not proceed to a due process hearing is not literal exhaustion nor its equivalent.  Therefore, the Court finds that Tyler B. has not exhausted his administrative remedies under the IDEA.

*Id.* at 1118.  The District Court further ruled that Tyler B. was required to exhaust his administrative remedies under the IDEA before proceeding with his claims:

42

> While the Court acknowledges that the
> District has implemented a special education
> program for Tyler, it does not find that such
> fact resolves Plaintiff's complaint and
> request for damages.  As noted, special
> education programs are only one of the many
> forms of relief which are available to
> individuals who qualify under the IDEA.
> Tyler has not dropped his complaint simply
> because he is now receiving the educational
> benefits to which he is entitled.  Rather, he
> is seeking damages for the deprivation of
> such benefits - deprivations which may be
> remedied under the IDEA statute.  Since
> Plaintiff may well benefit from counseling,
> rehabilitation, and other supportive services
> which are available under the IDEA, the Court
> does not agree with Plaintiff's argument that
> exhaustion is now futile.

*Id.* at 1119-1120.

Plaintiff argued at the hearing that formal compliance with the IDEA's exhaustion requirements is not mandated, citing *Witte v. Clark County School Dist.*, *supra*, 197 F.3d 1271 (9th Cir.1999).  Plaintiff's reliance on *Witte*, however, begs the question; *Witte* held that the plaintiff in that case was not required to exhaust the IDEA administrative remedies.

Plaintiff asserts that he suffered physical injury and psychological injury through the battery committed on his person by the handcuffing and false imprisonment for which he now seeks retrospective relief.  Plaintiff contends that the Ninth Circuit in *Robb* and *Kutasi* gave no indication that a different standard applies to disabled versus non-disabled students who are the victims of torts and civil rights violations:

> Under the Defendants' extreme reading of
> *Kutasi,* this is the result.  The 9th Circuit
> would allow a non-disabled student whose

43

civil rights were violated (i.e., use of unreasonable force, discrimination due to race or sexual orientation) to initiate litigation immediately without any exhaustion of administrative remedies required. *See Doe Ex. Rel. Doe v. St. of Hawaii Dept. of Educ.*, 334 F.3d 906 (9th Cir.2003).  Yet, the 9th Circuit would require a disabled student alleging the same civil rights violation - whether based on race, sexual orientation or the student's disability itself - to exhaust his or her administrative remedies under the IDEA due to the hypothetical idea that a student's IEP or section 504 plan could be utilized to provide psychological treatment to the student for the trauma.  In *Kutasi*, the 9th Circuit limited, but did not repudiate *Witte* and *Blanchard*, and clearly intended a certain class of civil rights claims brought by disabled students to fall outside the holding of *Robb*, *Kutasi, supra*, 494 F.3d at 1169.

Plaintiff argues that a due process hearing under California Education Code § 56501 is only available under four instances. Section 56501(a) provides that a due process hearing procedures may be initiated under any of the following circumstances:

(1) There is a proposal to initiate or change the identification, assessment, or educational placement of the child or the provision of a free appropriate public education to the child.

(2) There is a refusal to initiate or change the identification, assessment, or educational placement of the child or the provision of a free appropriate public education to the child.

(3) The parent or guardian refuses to consent to an assessment of the child.

(4) There is a disagreement between a parent or guardian and a local educational agency regarding the availability of a program appropriate for the child, including the question of financial responsibility ....

44

Plaintiff contends that this litigation concerns none of these circumstances:

> Plaintiff's section 504 plan is only relevant to the instant litigation in that it put the school on notice of Plaintiff's disabilities, including the involuntary manifestations of those disabilities, and gave the school a clear and pre-agreed-route as to how to handle those manifestations. This background information is relevant to show the intentional, or, at minimum, grossly reckless, nature of the school's actions on September 19, 2008.  Exhaustion of administrative remedies is not required because the case alleges one, discrete, historic, and tortious act of intentional discrimination against Plaintiff due to his disability for which retrospective relief is sought.

Plaintiff's position is unpersuasive.  The gravamen of the Complaint is that the District did not follow the IEP, i.e., that the School District did not "initiate" the IEP.  This case is analogous to the District Court's decision in *Fliess*. Nonetheless, the Court grants Plaintiff leave to amend to allege the facts upon which he relies in contending that he has exhausted administrative remedies; without the specific facts, and accompanying documents, the Court cannot determine as a matter of law whether it has jurisdiction to hear Plaintiff's claims.

District Defendant's motion to dismiss for lack of subject matter jurisdiction is GRANTED WITH LEAVE TO AMEND.  Plaintiff shall file a First Amended Complaint alleging the specific facts upon which intends to rely in contending that he has exhausted administrative remedies under the IDEA.

1      **2.   State Claims Barred by Plaintiff's Failure to**

2  **Exhaust Administrative Remedies Pursuant to California Code of**

3  **Regulations.**

4      The District Defendants move to dismiss the First Cause of

5  Action for violation of Sections 51(b), 51.5(a), and 54 of the

6  Unruh Civil Rights Act and the Fourth Cause of Action for

7  intentional infliction of emotional distress state law as barred

8  by Plaintiff's failure to exhaust administrative remedies

9  pursuant to the California Code of Regulations, 5 Cal.Code Regs.

10  §§ 3040-3054.  District Defendants assert that these

11  administrative regulations provide for an administrative remedy

12  under state law, separate and apart from the exhaustion

13  requirements of the IDEA.  District Defendants cite *California*

14  *Correctional Peace Officers Assn. v. State Personnel Board,*, 10

15  Cal.4th 1133, 1148 (1995): "'In brief, the rule is that where an

16  administrative remedy is provided by statute, relief must be

17  sought from the administrative body and this remedy must be

18  exhausted before the courts will act.'"

19      Plaintiff responds that District Defendants cite no

20  authority that the regulations adopted by the State of California

21  for behavioral intervention plans create a special exhaustion

22  requirement for state claims related to behavioral plans and

23  asserts that none exists.  Plaintiff notes that California Civil

24  Code § 52(e) of the Unruh Civil Rights Act provides:

25          Actions brought pursuant to this section are
            independent of any other actions, remedies,
26          or procedures that may be available to an

46

1    aggrieved party pursuant to any other law.

2        The Court's research located no decision expressly

3    addressing District Defendant's position.  There is no question

4    that the IDEA's exhaustion requirements are limited to claims for

5    violations of federal rights.  *See M.J. ex rel. G.J. v. Clovis*

6    *Unified School Dist.*, 2007 WL 1033444 *12 (E.D.Cal.2007)

7    (exhaustion of IDEA administrative remedies not required prior to

8    filing a claim for violation of the Unruh Act).[1]

9        At the hearing, District Defendants referred the Court to a

10   decision, subsequently provided by email to the Courtroom Deputy,

11   *Tri-County Special Education Local Plan Area v. County of*

12   *Tuolumne*, 123 Cal.App.4th 563 (2004).  In this case, a special

13   education local plan area and a county special education unit

14   sued the county and certain officials seeking to force the county

15   to continue providing IDEA mental health services for persons

16   with exceptional needs and to repay plaintiffs for the funds

17   spent to provide services after defendants' termination of

18   services.  The trial court sustained defendants demurrer that

19   plaintiffs had failed to exhaust available administrative

20   remedies prior to filing suit.  On appeal, plaintiffs/appellants

21

22        [1]Many courts faced with this issue have dismissed federal
     claims based on the failure to exhaust administrative remedies
23   under the IDEA and then declined to exercise supplemental
     jurisdiction over the remaining state law claims.  *See, e.g., S.M.*
24   *v. Contra Costa County Unified School Dist.*, 2007 WL 108456, * 4
     (N.D.Cal.2007); *Brown v. Napa Valley Unified School Dist.,* 2007 WL
25   202820, * 4 (N.D.Cal.2007); *Fraser v. Tamalpais Union School Dist.*,
     2006 WL 1348427, * 5 (N.D.Cal.2006); *Payne v. Peninsula School*
26   *Dist.*, 2007 WL 128884, * 4 (W.D.Wash.2007).

1   argued that their causes of action under the Unruh Civil Rights

2   Act and 42 U.S.C. § 1983 do not require exhaustion. *Id.* at 577.

3   After noting its doubt that appellants are aggrieved persons

4   under the Unruh Civil Rights Act, the Court of Appeal ruled:

> While the parties disagree about the meaning
> of the federal cases, in a real sense typical
> administrative exhaustion cases do not speak
> to the unique issues in the present case.
> The considerations that arise in requiring an
> *individual* to pursue an administrative remedy
> within the structure of the governmental
> entity that has deprived him or her of rights
> are somewhat different from the
> considerations when one subordinate
> government entity is required to invoke the
> administrative adjudicatory powers of a
> superior administrative body to resolve a
> dispute between the complainant and another
> subordinate entity.
>
> The first important consideration is that a
> governmental entity has no vested, individual
> rights in the administration of a particular
> program ... Appellants are purely creatures
> of statute, and it is clear that the
> Legislature could reassign administration of
> IDEA programs to a different entity if it
> chose to do so.  If the Legislature were to
> so choose, appellants would not be entitled
> to any sort of due process hearing or appeal
> to contest the action ....
>
> Second, and of greater importance, the
> statutory scheme clearly intends to invest
> the Superintendent of Public Instruction with
> the discretion to determine how and whether
> IDEA will be enforced against a community
> mental health department.  As noted above,
> the federal statute, in essence, requires
> appellants to provide mental health services
> if respondents do not.  While appellants are
> permitted to seek reimbursement from
> respondents, that permission is limited, by
> the express terms of the statute, to an
> administrative remedy ... From the standpoint
> of IDEA, appellants have no *right* to
> reimbursement from respondents; they have

> only the right to seek reimbursement through
> the administrative process.   (We are not
> presented in this case with the unfunded-
> state-mandate issue if the Superintendent of
> Public Instruction exercised discretion to
> leave the costs of mental health services
> with appellants.)
>
> As a result of these two factors, we conclude
> appellants have no rights enforceable against
> respondent through other causes of action, at
> least until the administrative process
> confers upon them such a right in the
> discretion of the Superintendent of Public
> Instruction.

*Id.* at 577-578.

*Tri-County Special Education Local Plan Area* is too factually different from the case before the Court to constitute persuasive authority that Plaintiff is required to exhaust administrative remedies under state law, separate and apart from the exhaustion requirements of the IDEA.

Because Plaintiff will be required to amend to allege facts establishing exhaustion of administrative remedies under the IDEA, resolution of this issue is deferred.  If the Court concludes that Plaintiff's federal claims are subject to the IDEA and administrative remedies have not been exhausted as required by law, Plaintiff's supplemental state law claims against the District Defendants will be dismissed pursuant to 28 U.S.C. § 1376.  District Defendants' motion to dismiss the First and Fourth Causes of Action for failure to exhaust state administrative remedies is DENIED WITHOUT PREJUDICE.

          3.  <u>Federal Law Precludes Plaintiff's Fourth Claim for Intentional Infliction of Emotional Distress</u>.

District Defendants further argue that Plaintiff is improperly using this lawsuit to challenge a teacher's authority to maintain order at school.  District Defendants move to dismiss the Fourth Claim for Intentional Infliction of Emotional Distress on the ground that the Paul D. Coverdell Teacher Protection Act of 2001," 20 U.S.C. § 6731 *et seq.* provides teachers with immunity from liability for such claims.[2]  The purpose of the Act "is to provide teachers, principals, and other school professionals the tools they need to undertake reasonable actions to maintain order, discipline, and an appropriate educational environment."  20 U.S.C. § 6732.  20 U.S.C. § 6736(a) provides:

> Except as provided in subsection (b) of this section, no teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if -
>
> (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;
>
> (2) the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;
>
> (3) if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken

---

[2] District Defendants described the statute as the "No Child Left Behind Act of 2001."  However, the correct name of the Act is as stated above.

> within the scope of the teacher's
> responsibilities.
>
>         (4) the harm was not caused by
> willful or criminal misconduct, gross
> negligence, reckless misconduct, or a
> conscious, flagrant indifference to the
> rights or safety of the individual harmed by
> the teacher; and
>
>         (5) the harm was not caused by the
> teacher operating a motor vehicle ....

Plaintiff responds that the Complaint alleges that Defendant Sinclair's actions were in violation of Federal and State laws, that Sinclair was not authorized to take the actions that allegedly caused harm to Plaintiff, that the harm to Plaintiff was caused by Defendant Sinclair's "criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety" of Plaintiff.  Plaintiff also refers to Section 6736(d)(1)(C):

> The limitations on the liability of a teacher
> under this subpart shall not apply to any
> misconduct that -
>
> ...
>
>         (C) involves misconduct for which
> the defendant has been found to have violated
> a Federal or State civil rights law ....

Plaintiff contends that the Complaint adequately alleges that Defendant Sinclair violated Federal and State civil rights laws.

District Defendants reply that this ground for dismissal is limited solely to the Fourth Claim for Intentional Infliction of Emotional Distress.  Further, District Defendants argue, the Complaint does not allege facts from which it may be inferred

that Defendant Sinclair's conduct amounted to "willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher."  District Defendants argue that the only misconduct alleged against Defendant Sinclair is that she notified the police in response to Plaintiff's admitted refusal to follow instructions by school staff.  District Defendants assert:

> Immunity is the rule.  Exceptions are, by definition, exceptions to that rule.  The rule applies, unless and until Plaintiff can plead facts demonstrating an exception that applies to the facts of the case.  Plaintiff fails to do so here.

District Defendants' motion to dismiss the Fourth Cause of Action on the ground of immunity pursuant to 20 U.S.C. § 6736(a) is GRANTED WITH LEAVE TO AMEND.

> ### 4.  California Government Code § 820.2 Bars Fourth Claim for Intentional Infliction of Emotional Distress.

District Defendants move to dismiss the Fourth Claim for Relief on the ground that it is barred by California Government Code § 820.2:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of discretion vested in him, whether or not such discretion be abused.

District Defendants cite *Jane Doe v. Petaluma City Sch. Dist.*, 830 F.Supp. 1560 (N.D.Cal. 1993), where a junior high school student brought an action against a school district,

counselor, and principal, alleging that defendants failed to put an end to sexual harassment inflicted on the student by her peers.   The District Court granted immunity pursuant to Section 820.2 with respect to the claims for intentional and negligent infliction of emotional distress "[b]ecause the acts and omissions of Mr. Horninghouse [the school counselor] that are the basis of the complaint were the result of the exercise of discretion vested in him ...."  *Id.* at 1583.   In so ruling, the District Court relied on *Kemmerer v. County of Fresno*, 200 Cal.App.3d 1426, 1438 (1988).   In *Kemmerer*, a civil service employee brought suit against the county and individual county officials based on disciplinary proceedings instituted against him and his discharge arising out of those proceedings.   One of the causes of action was for intentional infliction of emotional distress.   In finding immunity under Section 820.2, the *Kemmerer* Court held:

> We have no doubt that this analysis leads inevitably to the conclusion in the case at bench that the decision of Kelley and Velasquez to institute disciplinary proceedings against Kemmerer was a policy decision involving the exercise of discretion entitling them to immunity under Government Code section 820.2.   The decision whether or not to initiate discipline proceedings and what discipline to impose is placed initially on the department head and the decision is entirely within his discretion.   The decision involves the exercise of analysis and judgment as to what is just and proper under the circumstances and is not purely a ministerial act.

*Kemmerer*, 200 Cal.App.3d at 1437.

53

1    District Defendants also cite *Nicole M. By and Through*

2  *Jacqueline M. v. Martinez Unified School Dist.*, 964 F.Supp. 1369,

3  1389-1390 (N.D.Cal.1997).  There, a female student brought an

4  action against a school district, the superintendent and the

5  principal for sex discrimination, including a claim for

6  negligence and negligent infliction of emotional distress.  The

7  District Court ruled that "[d]ecisions by a school principal or

8  superintendent to impose discipline on students and conduct

9  investigations of complaints necessarily require the exercise of

10 judgment or choice, and accordingly are discretionary, rather

11 than ministerial, acts."

12   Plaintiff asserts that District Defendants and, apparently

13 the cases relied upon by District Defendants, fail to cite to the

14 legal standards governing the immunity set forth in Section

15 820.2.

16   In *Caldwell v. Montoya*, 10 Cal.4th 972 (1995), the

17 California Supreme Court, citing *Johnson v. State*, 69 Cal.2d 782

18 (1968), ruled:

19         ... *Johnson* concluded, a 'workable
           definition' of immune discretionary acts
20         draws the line between 'planning' and
           'operational' functions of government.
21         (*Johnson, supra,* 69 Cal.2d at pp. 793, 794.)
           Immunity is reserved for those '*basic policy*
22         *decisions* [which have] ... been [expressly]
           committed to coordinate branches of
23         government,' and as to which judicial
           interference would thus be 'unseemly.'  (*Id.*
24         at p. 793 ....)  Such 'areas of quasi-
           legislative policy-making ... are
25         sufficiently sensitive' (*id.* at p. 794) to
           call for judicial abstention from
26         interference that 'might even in the first

54

instance affect the coordinate body's
decision-making process' (*id*. at p. 793).

On the other hand, said *Johnson*, there is no
basis for immunizing lower-level, or
'ministerial,' decisions that merely
implement a basic policy already formulated.
(*Johnson*, *supra*, 69 Cal.2d at p. 796.)
Moreover, we cautioned, immunity applies only
to *deliberate and considered* policy
decisions, in which a '[conscious] balancing
[of] risks and advantages ... took place.
The fact that an employee normally engages in
"discretionary activity" is irrelevant if, in
a given case, the employee did not render a
considered decision ....' (*Id.* at p. 795, fn.
8).

Recognizing that 'it is not a tort for
government to govern' ..., our subsequent
cases have carefully preserved the
distinction between policy and operational
judgments.   Thus, we have rejected claims of
immunity for a bus driver's decision not to
intervene in one passenger's violent assault
against another ..., a college district's
failure to warn of known crime dangers in a
student parking lot ..., a county clerk's
libelous statements during a newspaper
interview about official matters ...,
university therapists' failure to warn a
patient's homicide victim of the patient's
prior threats to kill her ..., and a police
officer's negligent conduct of a traffic
investigation once undertaken ....

On the other hand, we have concluded that the
discretionary act statute does immunize
officials and agencies against claims that
they unreasonably delayed regulations under
which a murdered security guard might have
qualified himself to carry a defensive
firearm ... or negligently released a violent
juvenile offender into his mother's custody.

10 Cal.4th at 981-982.

Plaintiff cites *McCorkle v. City of Los Angeles*, 70 Cal.2d

252, 261-262 (1969) and *Martinez v. City of Los Angeles*, 141 F.3d

55

1373, 1379 (9th Cir.1998).  In *McCorkle*, a police officer
responded to a traffic accident and decided to conduct an
accident investigation.  While conducting the investigation, the
officer's negligence caused McCorkle, one of the drivers involved
in the accident, to be hit by a passing car.  The California
Supreme Court ruled:

> However, classification of the act of a
> public employee as 'discretionary' will not
> produce immunity under section 820.2 if the
> injury to another results, not from the
> employee's exercise of 'discretion vested in
> him' to undertake the act, but from his
> negligence in performing it after having made
> the discretionary decision to do so ....
>
> Accordingly, if we were to accept the City's
> premise that Officer Lombardo exercised his
> discretion in undertaking his investigation
> of the Phillips accident, section 820.2 did
> not clothe him with immunity from the
> consequences of his negligence in conducting
> it.  He would have been immune if plaintiff's
> injury had been the *result* of his -
> Lombardo's - exercise of discretion ... It
> was not: it resulted from his negligence
> after the discretion, if any, had been
> exercised.  Because the essential requirement
> of section 820.2 - a causal connection
> between the exercise of discretion and the
> injury - did not exist, the statutory
> immunity does not apply.

In *Martinez v. City of Los Angeles*, the Ninth Circuit, citing
*McCorkle,* ruled:

> Here, Martinez's allegations go beyond the
> contention that the LAPD officers acted
> improperly in deciding to seek his arrest.
> He alleges that they acted negligently in
> conducting the investigation to verify that
> he was the correct suspect, and they
> intentionally caused his arrest and
> imprisonment in Mexico.

56

> Discretionary act immunity does not protect
> the LAPD officers from liability for carrying
> out these acts.

*Martinez* also relied on California Government Code § 820.4 in
precluding immunity from liability for the officers for the
specific claims of false arrest and false imprisonment.

District Defendants reply that Plaintiff's reliance on
*McCorkle* is misplaced:

> Ms. Sinclair made the discretionary decision
> to notify the police; then she performed the
> act of having the police notified.  Once she
> notified the police, her act pursuant to her
> discretionary decision was complete.  She did
> not trip and fall into Plaintiff on her way
> to the telephone and cause Plaintiff injury.
> She did not drop a telephone on Plaintiff's
> head while making a call to the police.

> Under Plaintiff's theory, all defendants
> would be held liable for injuries occurring
> after the discretionary decisions and acts
> are completed.  To use *McCorkle* as an
> example, suppose the officer completed the
> accident investigation without any problems,
> then sent the plaintiff on his way.  While
> driving home, the plaintiff gets hit by
> another car and is injured.  Technically, if
> the officer had not decided to conduct the
> investigation, the plaintiff would not have
> been where he was at that time, and would not
> have been hit by the second car.  That does
> mean [sic] the officer loses discretionary
> immunity when he completes performance of his
> discretionary act without negligence.

> Here, Plaintiff's entire lawsuit against the
> District and Ms. Sinclair is based on *one
> decision* to contact the police.  That
> decision was executed flawlessly (the police
> were contacted and did arrive), and Plaintiff
> did not suffer any injury in the course of
> Defendants contacting the police.

District Defendants' motion to dismiss the Fourth Cause of

57

1   Action on the ground of Government Code § 820.2 immunity is

2   DENIED WITHOUT PREJUDICE.  The California Supreme Court's

3   decisions in *Johnson* and *Caldwell* indicate that the alleged

4   actions of Defendant Sinclair was a ministerial decision

5   implementing a basic policy already formulated, i.e., Plaintiff's

6   IEP.

7           5.   Complaint Fails to Establish Improper Motive.

8        District Defendants contend that all of Plaintiff's claims

9   against District Defendants require a *prima facie* showing of

10  improper motive, i.e., discriminatory intent.  District

11  Defendants contend that they are entitled to a more definite

12  statement, citing *Crawford-El v. Britton*, 523 U.S. 574 (1998).

13       In *Crawford-El*, the Supreme Court held that a plaintiff

14  bringing a constitutional action against government officials for

15  damages, for which an official's improper motive is a necessary

16  element, need not adduce clear and convincing evidence of

17  improper motive in order to defeat an official's motion for

18  summary judgment.  The Supreme Court then stated:

19               Though we have rejected the Court of Appeals'
                 solution, we are aware of the potential
20               problem that troubled the court.  It is
                 therefore appropriate to add a few words on
21               some of the existing procedures available to
                 federal trial judges in handling claims that
22               involve examination of an official's state of
                 mind.
23
                 When a plaintiff files a complaint against a
24               public official alleging a claim that
                 requires proof of wrongful motive, the trial
25               court must exercise its discretion in a way
                 that protects the substance of the qualified
26               immunity defense.  It must exercise its

> discretion so that officials are not
> subjected to unnecessary and burdensome
> discovery or trial proceedings.  The district
> judge has two primary options prior to
> permitting any discovery at all.  First, the
> court may order a reply to the defendant's or
> a third party's answer under Federal Rule of
> Civil Procedure 7(a), or grant the
> defendant's motion for a more definite
> statement under Rule 12(e).  Thus, the court
> may insist that a plaintiff 'put forward
> specific, nonconclusory factual allegations'
> that establish improper motive causing
> cognizable injury in order to survive a
> prediscovery motion for dismissal or summary
> judgment ... This option exists even if the
> official chooses not to plead the affirmative
> defense of qualified immunity.  Second, if
> the defendant does plead the immunity
> defense, the district court should resolve
> that threshold question before permitting
> discovery ... To do so, the court must
> determine whether, assuming the truth of the
> plaintiff's allegations, the official's
> conduct violated clearly established law.
> Because the former option of demanding more
> specific allegations of intent places no
> burden on the defendant-official, the
> district judge may choose that alternative
> before resolving the immunity question, which
> sometimes requires complicated analysis of
> legal issues.

523 U.S. at 597-598.

District Defendants argue that the Complaint alleges no

facts from which a discriminatory motive may be inferred and

contends that the Complaint merely alleges the legal conclusion

that the decision to contact the police was discriminatory.

In addition, District Defendants argue that the Complaint's

reference to "shutting down" alleges no facts describing what

this physical and mental condition entails as do the allegations

of "safe zones."  District Defendants further assert that the

59

Complaint alleges no facts establishing what occurred on September 29, 2008: "There are no facts regarding when or where this 'shut down' occurred, who was present, or what occurred leading up to the police being called."

District Defendants' motion to dismiss on this ground is GRANTED WITH LEAVE TO AMEND.  The allegations that District Defendants' conduct was discriminatory are legal conclusions; no facts supporting the basis, how and why the conduct was discriminatory, other than that Plaintiff suffered disabilities are alleged.  Given the Supreme Court's recent rulings concerning Rule 12(b)(6) motions and the dicta from *Crawford-El*, Plaintiff should to plead specific facts to support the conclusion that the District Defendants' conduct was motivated by intentional (disability) discrimination.

        6.   <u>Statement of Claim for Violation of the Unruh Civil Rights Act</u>.

            a.   <u>Election of Remedies</u>.

    The First Cause of Action against Sonora School District is for violation of Section 51(b), 51.5(a), and 54 of the Unruh Civil Rights Act "by discriminating against Plaintiff on account of his disability and by causing Plaintiff to be forcibly removed from Sonora Elementary School on account of his disability."[3]

_____

[3]California Civil Code § 51(b) provides that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their ... disability ... are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Section 51(f) provides that "[a] violation of the right of any

Civil Code § 54 is not part of the Unruh Civil Rights Act; it is part of the Disabled Persons Act.

California Civil Code § 54.3(c) provides that "[a] person may not be held liable for damages pursuant to both this section and Section 52 for the same act or failure to act."

As explained in *Molski v. Arciero Wine Group*, 164 Cal.App.4th 786, 791-792 (2008):

> [A disabled person] may file an action for monetary relief under the Unruh Civil Rights Act (§ 51), to recover actual damages and automatic minimum penalties ... However, the plaintiff must plead and prove intentional discrimination ....
>
> Alternatively, the plaintiff may file an action for monetary relief under the DPA (§ 54), in which case he or she need not prove any intentional conduct ....
>
> ... A plaintiff must make an election between recovering under the Unruh Civil Rights Act or the DPA ....

District Defendants contend that Plaintiff improperly attempts to sue under both the Unruh Civil Rights Act and the Disabled Persons Act and must be required to elect one remedy.

---

individual under the Americans with Disabilities Act of 1990 shall also constitute a violation of this section."
California Civil Code § 51.5(a) provides: "No business establishment of any kind whatsoever shall discriminate against ... any person in this state on account of any characteristic listed or defined in subdivision (b) ... of Section 51 ...."
California Civil Code § 54(a) provides that "[i]ndividuals with disabilities or medical conditions have the same right as the general public to the full and free use of ... public buildings ..., public facilities, and other public places.  Section 54(c) provides that "[a] violation of the right of an individual under the Americans with Disabilities Act of 1990 also constitutes a violation of this section."

1    Plaintiff cites Rule 8(a)(3), Federal Rules of Civil

2    Procedure, which provides that the relief sought in a complaint

3    "may include relief in the alternative or different types of

4    relief," and Rule 8(d)(2) & (3), allowing alternative or

5    inconsistent claims for relief.  Plaintiff cites *Clauson v.*

6    *Superior Court*, 67 Cal.App.4th 1253, 1256 (1998), in which the

7    Court of Appeals ruled that a motion to strike inconsistent

8    remedies should not have been granted and that, once a verdict is

9    returned, the plaintiff must then elect the remedy.

10    District Defendants' motion to dismiss the First Cause of

11   Action on this ground is DENIED as election of remedies is

12   premature.

13                 b.   <u>Intentional Discrimination</u>.

14    District Defendants move to dismiss the First Cause of

15   Action on the ground that the Complaint fails to allege facts

16   establishing intentional discrimination.  District Defendants

17   cite *Harris v. Capital Growth Investors XIV,* 52 Cal.3d 1142, 1175

18   (1991): "[A] plaintiff seeking to establish a case under the

19   Unruh Act must plead and prove intentional discrimination."

20    There is recent California Supreme Court authority that the

21   parties may need to discuss.  In *Munson v. Del Taco, Inc.*, 46

22   Cal.4th 661 (June 11, 2009), the California Supreme Court granted

23   the Ninth Circuit's request to decide "'[m]ust a plaintiff who

24   seeks damages under California Civil Code § 52, claiming the

25   denial of full and equal treatment on the basis of disability in

26   violation of the Unruh Civil Rights Act (Civ.Code § 51) and the

Americans with Disabilities Act of 1990 (42 U.S.C. § 1210 et seq.), prove "intentional discrimination."'  The California Supreme Court addressed whether "an Unruh Civil Rights Act plaintiff relying on subdivision (f) of section 51 obtain damages for denial of full access to a business establishment in violation of the ADA and the Unruh Civil Rights Act without proof the denial involved intentional discrimination" and concluded that "a plaintiff proceeding under section 51, subdivision (f) may obtain statutory damages on proof of an ADA access violation without the need to demonstrate additionally that the discrimination was intentional."  *Munson* involved an alleged violation of Title III of the ADA.  In *Lentini v. California Center for the Arts, Escondido*, 307 F.3d 837 (9th Cir.2004), the Ninth Circuit ruled that "[i]t is undisputed that a plaintiff need not show intentional discrimination in order to make out a violation of the ADA."  *Id.* at 846.  However, *Lentini* involved an alleged violation of Title III of the ADA.  In *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir.2001), the Ninth Circuit held:

> To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant ....

*Duvall* adopted a deliberate indifference standard to determine intentional discrimination on the part of the defendant for recovery of monetary damages under Title II of the ADA or the Rehabilitation Act.  *Id.*  "Deliberate indifference requires both

knowledge that a harm to a federally protected right is
substantially likely, and a failure to Act upon that likelihood."
*Id.* at 1139.   Consequently, to the extent that the Complaint may
be construed to allege a violation of the Unruh Civil Rights Act
or the Disabled Persons Act based on a violation of the ADA,
because the Complaint alleges a violation of Title II of the ADA,
Plaintiff must plead and prove intentional discrimination in
order to state a claim for relief in the First Cause of Action.

Plaintiff argues that the facts alleged in the Complaint,
when read as a whole, plead intentional discrimination.
Plaintiff refers to allegations that District Defendants knew of
Plaintiff's disability, knew how to handle it because of the
provisions of the IEP, yet threatened Plaintiff with police
intervention and caused the police to forcibly remove Plaintiff
from the school grounds.   The Complaint alleges that there was no
justification for this treatment.   The Complaint alleges that
District Defendants committed these acts "maliciously,"
"oppressively" and "in bad faith, with the wrongful intent of
injuring Plaintiff, and in conscious disregard of Plaintiff's
rights."   None of these allegations state that this conduct was
undertaken to discriminate against Plaintiff because of his
disabilities.   Plaintiff asserts that, while he can amend to
allege that Defendant Sinclair acted out of a motive to punish
and retaliate against Plaintiff because of his disability, this
is "already apparent from a reading of the facts of the
Complaint."   Plaintiff notes that Rule 9(b), Federal Rules of

64

Civil Procedure, provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

District Defendants refer to the allegation that Plaintiff "shut down" and became unresponsive to school staff. District Defendants contend that Plaintiff only alleges a legal conclusion that the decision to contact the police was discriminatory and provide no facts from which it may be inferred that this decision was based on Plaintiff's disability. District Defendants argue that Plaintiff's position is absurd:

> Plaintiff's position is that if a *non-disabled* student became completely unresponsive to all school personnel, refused to follow any directions, and refused to follow the teacher back into school buildings, it would *not* be viewed as 'malicious' and 'oppressive' for school personnel to contact the police. Plaintiff does not demand equality, he demands exemption for school rules.

District Defendants further reply that Plaintiff's reliance on Rule 9(b) ignores the Supreme Court's comments in *Crawford-El*. *See discussion supra*.

District Defendants' motion to dismiss on this ground is GRANTED WITH LEAVE TO AMEND. Plaintiff must allege facts showing intentional discrimination.

            7.   <u>Intentional Infliction of Emotional Distress</u>.

District Defendants move to dismiss the Fourth Cause of Action for intentional infliction of emotional distress for failure to state a claim upon which relief can be granted.

District Defendants argue that the Complaint fails to plead

a statutory violation as required to establish liability against a public entity, citing California Government Code § 815(a):

> Except as otherwise provided by statute:
>
> (a) A public entity is not liable for an injury, whether such injury arises out of an Act or omission of the public entity or a public employee or any other person.

Plaintiff responds that a public employee may be liable for an injury "caused by his Act or omission to the same extent as a private person." California Government Code § 820(a). Plaintiff further contends that he has pled violations of state and federal statutes governing protection of the civil rights of disabled persons "which buttress his intentional infliction of emotional distress cause of action."

To the extent that the Fourth Cause of Action seeks to impose tort liability on the School District for intentional infliction of emotional distress, Section 815(a) bars the cause of action. Section 815 was enacted to eliminate public entity liability based upon common law tort claims. *See Williams v. Horvath*, 16 Cal.3d 834, 838 (1976); *see also Cochran v. Herzog Engraving Co.*, 155 Cal.App.3d 405, 409 (1984)("Government Code section 815, enacted in 1963, abolished all common law or judicially declared forms of liability for public entities, except for such liability as may be required by the federal or state Constitution.") .

District Defendants motion to dismiss the Fourth Cause of Action as alleged against the School District is **GRANTED WITH**

1  PREJUDICE based on Government Code § 815.

2      District Defendants further argue that the Complaint does
3  not allege facts stating a claim for intentional infliction of
4  emotional distress.

5      Under California law, the elements of a claim for
6  intentional infliction of emotional distress are: (1) extreme and
7  outrageous conduct by the defendant with the intention of
8  causing, or reckless disregard of the probability of causing,
9  emotional distress; (2) the plaintiff's suffering severe or
10 extreme emotional distress; and (3) actual and proximate
11 causation of the emotional distress by the defendant's outrageous
12 conduct.  *Christensen v. Superior Court*, 54 Cal.3d 868, 903
13 (1991).  "Conduct to be outrageous must be so extreme as to
14 exceed all bounds of that usually tolerated in a civilized
15 society."  *Id*.

16     District Defendants argue that the fact alleged do not
17 establish outrageous conduct under this standard.  The Complaint
18 alleges that Defendant Sinclair warned Plaintiff that the police
19 would be called if Plaintiff did not follow instructions and that
20 the police were called because Plaintiff was unresponsive and
21 refused to follow instructions of school staff.

22     Plaintiff cites *Doe ex rel. Doe v. St. of Hawaii Dept. of
23 Education*, 334 F.3d 906 (9th Cir.2003).

24     In *Doe*, Doe, a second grade student, was sent to the
25 principal, Keala, to be disciplined for fighting.  Doe refused to
26 stand against the wall for his time-out punishment.  Keala

followed through on his threat to take Doe outside and tape him to a nearby tree if he did not stand still.  Keala used masking tape to tape Doe's head to the tree.  The tape remained for about five minutes until a fifth-grade student told Keala that she did not think he should be doing that.  Keala instructed the girl to remove the tape, which she did.  334 F.3d at 908.  Keala claimed qualified immunity from liability under Section 1983 for a seizure in violation of the Fourth Amendment and for excessive forcible restraint.

Plaintiff relies on *Doe* for the proposition that Keala was not entitled to qualified immunity even though he warned Doe that he would tape him to the tree. This does not establish an intentional infliction of emotional distress claim, although the conduct in *Doe* was much more egregious.

Plaintiff also cites *Banks v. Modesto City School District*, 2005 WL 2233213 (E.D.Cal.2005).  In *Banks,* Banks, a seventh grade student diagnosed with autism and assigned an aide, transferred to a new school.  While in the new school, Banks reacted in an aggressive manner.  A teacher brought Banks to the school office where the principal, vice principal, and a police officer were present.  When Banks became more aggressive, the police officer pepper-sprayed her in the face.  Subsequently, Banks had other incidents of aggressive behavior and was reminded by one of the defendants of the pepper-spray incident.  On another occasion, Banks was taken from the classroom; Banks begged the teachers not to see the police and grew agitated when

68

she saw the police officer, who proceeding to handcuff Banks.
Judge Coyle denied a motion to dismiss the intentional infliction
of emotional distress claim on the ground that the alleged
conduct was not outrageous:

> Here, Plaintiff's teacher, Defendant Letine,
> taunted the mentally disabled child about a
> traumatic incident, the use of the pepper
> spray, and threatened Plaintiff with its
> repeated use.  Other District Defendants
> threatened Plaintiff with seeing the police
> and intentionally brought Plaintiff to
> Officer Urquhart a second time despite her
> pleas not to see the police.
>
> Even ignoring the fact that Plaintiff was
> placed in handcuffs at the hands of Officer
> Urquhart, at this stage of the litigation,
> this sort of conduct, particularly by school
> officials who are entrusted with the care of
> hundreds of children, is sufficient to state
> a claim for IIED.

Relying on *Banks*, Plaintiff argues that "[h]andcuffing a disabled
child as a means of controlling the child's involuntary
manifestations of their disability exceeds the bounds of decency
in a civilized society."

District Defendants reply that the facts alleged against
District Defendants are that Plaintiff became completely
unresponsive to all school personnel; Plaintiff was located
outside on a field; Plaintiff was refusing to accompany his
teachers back into school buildings; Plaintiff refused to follow
directions even after being advised that the police would be
called if Plaintiff continued his refusal; Defendant Sinclair
instructed the police to be called when Plaintiff continued to
refuse to follow her back into school buildings.  District

1   Defendants are not alleged to have engaged in any further conduct

2   after the police arrived.  District Defendants argue that the

3   actions alleged to have been taken by Defendant Sinclair cannot

4   reasonably be regarded as being beyond all bounds of decency in a

5   civilized society as a matter of law.

6       District Defendants' motion to dismiss the Fourth Cause of

7   Action on this ground is GRANTED WITH LEAVE TO AMEND.  The

8   alleged actions by Defendant Sinclair in no way approach those at

9   issue in *Doe ex rel. Doe* or *Banks*.

10          8.  <u>Section 504 of the Rehabilitation Act, Title II of</u>

11  <u>the Americans with Disabilities Act, and 42 U.S.C. § 1983</u>.

12      District Defendants move to dismiss the Fifth Cause of

13  Action for violation of Section 504 of the Rehabilitation Act

14  against the School District by discriminating against C.B. "on

15  the basis of his disability ... by threatening C.B. with police

16  involvement and by in fact causing such police intervention

17  solely due to C.B.'s disabilities; the Sixth Cause of Action for

18  violation of Title II of the Americans with Disabilities Act

19  against the School District by discriminating against C.B. "on

20  the basis of his disability ... by threatening C.B. with police

21  involvement and by in fact causing such police intervention

22  solely due to C.B.'s disabilities; and the Seventh Cause of

23  Action against Defendant Sinclair in her individual capacity for

24  violation of 42 U.S.C. § 1983 because of Defendant Sinclair's

25  violations of Section 504 of the Rehabilitation Act and Title II

26  of the ADA by "threatening Plaintiff due to his disability and

causing Plaintiff to face harsh and unreasonable discipline and forcible removal from school by the police on account of his disability."

District Defendants contend that the Complaint fails to plead facts establishing prima facie claims of violations of these statutes.

A plaintiff bringing a claim under Section 504 of the Rehabilitation Act and Title II of the ADA must show (1) he is an individual with a disability; (2) he is otherwise qualified to receive the benefit; (3) he was denied the benefits of the program solely by reason of his disability; and (4) the program receives federal financial assistance.  *Duvall v. County of Kitsap*, *supra,* 260 F.3d at 1135.

District Defendants assert that a plaintiff bringing claims under Title II of the ADA and Section 504 of the Rehabilitation Act in the special education context must also show that the educational decisions relating to the student were so inappropriate as to constitute either bad faith or gross misjudgment.  As authority for this contention, District Defendants cite *Monahan v. Nebraska,* 687 F.2d 1164, 1170-1171 (8th Cir.1982), *cert. denied*, 460 U.S. 1012 (1983); *Alex G. v. Board of Trustees of Davis Joint Unified Sch. Dist.*, 387 F.Supp.2d 1119, 1124 (E.D.Cal.2005); and *Hoekstra v. Independent Sch. Dist, No. 283*, 103 F.3d 624, 626-627 (8th Cir.1996), *cert. denied*, 520 U.S. 1244 (1997).  In addition, a plaintiff seeking monetary damages under Section 504 must prove that defendants

71

1    acted with deliberate indifference.  *Duvall v. County of Kitsap,*
2    *supra*, 260 F.3d at 1138-1139.

3         District Defendants place special emphasis on *Alex G.*, a
4    case involving summary judgment.

5         In *Alex G.*, Alex, a third-grade student with autism, was
6    enrolled in the school district for the 2001-2002 school year.
7    In accordance with Alex's IEP, the District placed Alex in a
8    regular education classroom with support services.  In addition,
9    the District developed a behavior intervention plan (BIP) to
10   address Alex's history of aggressive outbursts and violent
11   tendencies.  As part of Alex's BIP, the District established an
12   emergency plan that allowed the use of physical restraints when
13   necessary to protect other students of staff from physical harm.
14   Alex's parents initially consented to implementation of the BIP
15   and the use of physical restraints.  However, in June 2002, just
16   prior to Alex starting the second grade, Alex's parents withdrew
17   their consent.  Alex's behavior problems continued in the second
18   grade.  On the first day of school, Alex had a serious behavior
19   incident that resulted in a three-day suspension.  Alex had two
20   more serious behavior incidents in October 2002, during the first
21   week he returned to school.  During these incidents, two of
22   Alex's special education assistants used emergency physical
23   restraints to bring Alex under control in accordance with the
24   District's plan for emergency interventions.  In December 2002,
25   Alex had another serious behavior incident involving his teacher
26   and another student, resulting in a three-day suspension.  In

1 February 2003, Alex's disruptive behavior continued to escalate.

2 He was unable to remain in the classroom for more than ten

3 minutes at a time and spent the majority of his day outside with

4 one or two of his aides.   In connection with Alex's Section 504

5 discrimination claim, Judge Levi ruled:

> Defendants contend that, even if plaintiffs
> make a sufficient showing of an IDEA
> violation, they fail to show that defendants
> acted with bad faith, gross misjudgment, or
> deliberate indifference ... In response,
> plaintiffs assert that the totality of events
> reveals a pattern of defendants repeatedly
> punishing Alex for behaviors that are part of
> his disability and sabotaging his education
> program to justify removing him from the
> regular classroom setting ... This pattern
> began, they assert, when Alex's parents
> withdrew their consent to physical
> restraints, and it escalated until defendants
> succeeded in removing Alex from Valley Oak by
> means of the TRO. ...
>
> Plaintiffs' characterization of the evidence
> is not reasonable and could not be accepted
> by a reasonable factfinder.  The
> actions/omissions plaintiffs identify,
> whether taken as a whole or looked at
> individually, do not suggest bad faith, gross
> misjudgment, or deliberate indifference on
> the part of the District.  First, plaintiffs
> allege that defendants wrongfully used
> physical restraints on Alex on two occasions
> in October 2002, despite the explicit
> withdrawal of consent to such restraints by
> Alex's parents in June 2002 ... These actions
> demonstrate bad faith or gross misjudgment,
> they contend, because the withdrawal of
> consent was explicit, and there could have
> been no confusion on this issue ....
>
> As an initial matter, it is unclear that the
> District's actions violated any law, given
> that state law explicitly allows school
> officials to physically restrain students
> when the student poses an immediate danger to
> himself or others.  Cal.Code. Regs. tit.5, §

3052(I).  Here, Alex was restrained because he was jumping across wet table-tops.  The teachers could reasonably have determined that Alex posed an immediate physical danger to himself.  Moreover, Inchausti and Arostegny used physical restraints approved by the District as part of the District's emergency intervention plan.

Furthermore, even if the use of physical restraints did violate the IDEA, there is no evidence that defendants acted with bad faith, gross misjudgment, or deliberate indifference in doing so.  Rather, the evidence suggests that the teachers believed they were acting within their discretion to protect Alex from imminent harm to himself.  In fact, Inchausti and Arostegny have both stated that they believed that Alex's prior BIP, which allowed physical restraints, was still in effect in October 2002 ... Alex has presented no evidence calling into question their good faith belief.  Accordingly, plaintiffs' argument regarding the physical restraints is unpersuasive.

387 F.Supp.2d at 1124-1125.

District Defendants also cite *Thompson v. Board of the Special Sch. Dist. No. 1 (Minneapolis)*, 144 F.3d 574, 580 (8th Cir.1998) and *S.S. v. Eastern Kentucky University*, 431 F.Supp.2d 718, 731 (E.D.Ky.2006), *aff'd*, 532 F.3d 445 (6th Cir.2008), as holding that imposition of discipline on a disabled student, including calling the police, does not amount to bad faith, gross misjudgment, or deliberate indifference.

In *Thompson*, Thompson was suspended twice because of behavioral problems, was again suspended for fighting, and after he started grabbing, pushing and kicking other students, school officials called the police, who took Thompson home.  144 F.3d at 577.  Thompson's mother alleged claims under the ADA and Section

74

504, claiming that the School District failed to alter its discipline policies to accommodate her son, contending that her son was put in "time out" rooms and isolated when he misbehaved and was suspended on several occasions. *Id.* at 580.  Noting that the plaintiff must show bad faith or gross misjudgment, the Eighth Circuit ruled:

> Buckhannon's claim that the District mistreated Thompson arises from allegations that Thompson did not receive an education for part of the 1994 school year and was frequently suspended.  Buckhannon's argument fails because she chose to take her son out of school after the 1994 police intervention. Even if Buckhannon was frustrated by the police involvement, she failed to challenge the District's actions.  Instead, after the incident, she collaborated with the District in choosing a different placement for her son.  As to the frequent suspensions, the record is clear that Thompson's suspensions were for exhibiting dangerous behavior to himself and to others.  Consequently, we reject Buckhannon's claims.

*Id.* at 580.

In *S.S.,* the plaintiff alleged that he was mocked and attacked by one of his frequent attackers.  Teachers responded and separated the two and called the police.  The school and the police investigated but could not determine who was responsible for the fight.  Both students were suspended, the plaintiff for five days and the other student for three.  431 F.Supp.2d at 725. The District Court rejected the plaintiff's discrimination claim:

> There is no reason to think that calling the police in the second instance had anything to do with Plaintiff's disability.  Indeed, the police reports indicate that both students were being investigated.

*Id.* at 731.

District Defendants argue that the Complaint pleads no facts establishing bad faith, gross misjudgment, or deliberate indifference.  The Complaint alleges that Plaintiff "shut down" on September 29, 2008, that he became unresponsive and refused to follow instructions from school staff.  District Defendants argue that the Complaint alleges only a legal conclusion that the decision to contact the police was discriminatory and that the Complaint alleges no facts establishing any intentional discrimination solely on the basis of Plaintiff's disability.

Plaintiff responds that the allegations of the Complaint plead the required elements for these causes of action. Plaintiff contends that District Defendants actually are arguing that the Complaint fails to meet a special pleading requirement that the District Defendants acted in bad faith, with gross misjudgment, or with deliberate indifference.  Plaintiff cites *Wong v. Regents of University of California*, 410 F.3d 1052 (9th Cir.2005), as holding that no special pleading requirement for bad faith or gross misjudgment is required in the Ninth Circuit.

*Wong* involved review of the district court's rulings on summary judgment; there is no discussion in *Wong* of pleading requirements.  This case is of no help.

Plaintiff also contends: "This case, similarly, does not involve the 'special education' context which triggers the heightened pleading requirement as Plaintiff is not alleging violations of the IDEA but rather a violation of his 4th

amendment and 14th amendment rights which was directly motivated by his disability."

The Complaint specifically alleges that Defendant Sinclair called the police rather than comply with Plaintiff's IEP.  While Plaintiff argues that the IDEA does not apply to his claims, the allegation in the Complaint that Defendant Sinclair failed to follow the IEP seriously undermines this contention.

Plaintiff further argues that the cases relied upon by District Defendants are distinguishable and/or not binding on this Court.

Plaintiff notes that *Alex G.* involved summary judgment, thereby allowing the District Court to determine bad faith, gross misjudgment or deliberate indifference on a fully developed factual record.  Plaintiff notes that the BIP allowed physical restraint to protect students and staff from physical harm, that the teachers and staff worked in good faith to implement a behavioral plan that would accommodate Alex G., and that Alex G. continued to pose a danger to himself and others on a regular basis.  Plaintiff argues that the event alleged in the Complaint does not concern an incident which qualifies for emergency behavioral intervention under the California Code of Regulations or a student who qualified for an emergency intervention plan. Plaintiff cites 5 Cal.Code.Regs. § 3052(i):

> Emergency interventions may only be used to
> control unpredictable, spontaneous behavior
> which poses clear and present danger of
> serious physical harm to the individual or
> others and which cannot be immediately

1          prevented by a response less restrictive than
2          the temporary application of a technique used
           to contain the behavior.

3  Plaintiff refers to the allegations that Plaintiff was "shut

4  down" and, when the police arrived, sitting on a bench with his

5  head down.

6          Plaintiff further argues that the cases upon which District

7  Defendants rely in arguing that calling the police does not

8  amount to bad faith or gross misjudgment are distinguishable.   In

9  *Thompson*, the police took the student home following an incident

10  in which the student started grabbing, pushing and kicking other

11  students.   In *S.S.,* the police were called to investigate a

12  physical altercation and investigated both the disabled and non-

13  disabled student.   Plaintiff argues that there was no physical

14  altercation when Defendant Sinclair told Plaintiff she would call

15  the police and did call the police, resulting in his forcible

16  removal from the school.   Plaintiff argues that bad faith and

17  gross misjudgment "are manifest in utilizing police power to

18  punish and exclude a disabled child from school grounds."

19          District Defendants reply that Ninth Circuit authority

20  requires a showing of intentional discrimination.   *See discussion*

21  *supra*.   Further, District Defendants argue, while Plaintiff

22  minimizes the importance of when a school is authorized to call

23  the police, his entire lawsuit is based on this single fact, that

24  he was "shut down" and the police were called.   District

25  Defendants assert that the cases cited demonstrate that calling

26  the police concerning a student who is known to be disabled do

not of themselves provide an inference of intentional

discrimination based on that disability, citing *Thompson* and *S.S.*

District Defendants note that Plaintiff cites no case holding

that a decision to contact the police has ever been held to be

discriminatory.

District Defendants further argue that Plaintiff "comes

dangerously close to violating Rule 11 ... when he attempts to

distinguish *Alex G.*'s holding from the instant case by arguing

that *Alex G.* concerned a student with a history of 'aggressive

outbursts and violent tendencies' and stating that 'the instant

litigation does not concern an incident which qualifies for

emergency behavioral intervention.'" District Defendants assert:

> As Plaintiff has asserted his privacy rights
> at this time (through counsel during the Rule
> 26(f) conference), Defendants are precluded
> from revealing any detailed information.
> However, Plaintiff is well aware of his own
> 'history' as it relates to the facts of this
> case and Defendants' decision to call the
> police.

In addition, District Defendants contend that Plaintiff's

distinction of *Alex G.* based on the emergency behavioral plan

that allowed physical restraints to protect students and staff

from harm, is misplaced because the school in *Alex G.* used

physical restraints despite the parents withdrawal of consent to

do so.  District Defendants cite 34 C.F.R. § 300.530(b)(1):

> School personnel under this section may
> remove a child with a disability who violates
> a code of student conduct from his or her
> current placement to an appropriate interim
> alternative educational setting, another
> setting, or suspension, for not more than 10

79

consecutive school days (to the extent those
alternatives are applied to children without
disabilities), and for additional removals of
not more than 10 consecutive school days in
that same school year for separate incidents
of misconduct (as long as those removals do
not constitute a change of placement under §
300.536).

District Defendants argue that the Complaint establishes that
Plaintiff violated a code of student conduct by refusing to
accompany teachers back into the school buildings.  Despite this
admission, Plaintiff provides only a legal conclusion that the
decision to contact the police was discriminatory because of
Plaintiff's disability.

Although there may be more to this incident than is alleged
in the Complaint, District Defendants' motion to dismiss on this
ground is DENIED.  The Complaint sufficiently alleges the claims;
District Defendants' real argument is that Plaintiff cannot prove
them.  That is an issue for summary judgment or trial.

9.  Qualified Immunity.

Defendant Sinclair moves to dismiss the Seventh Cause of
Action for violation of 42 U.S.C. § 1983 because of Defendant
Sinclair's violations of Section 504 of the Rehabilitation Act
and Title II of the ADA by "threatening Plaintiff due to his
disability and causing Plaintiff to face harsh and unreasonable
discipline and forcible removal from school by the police on
account of his disability" on the ground of qualified immunity
from liability for damages.

Qualified immunity serves to shield government officials

80

"from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional

rights of which a reasonable person would have known."  *Harlow v.*

*Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Pearson v. Callahan*,

___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court summarized

the purpose of qualified immunity:

> Qualified immunity balances two important
> interests-the need to hold public officials
> accountable when they exercise power
> irresponsibly and the need to shield
> officials from harassment, distraction, and
> liability when they perform their duties
> reasonably. The protection of qualified
> immunity applies regardless of whether the
> government official's error is "a mistake of
> law, a mistake of fact, or a mistake based on
> mixed questions of law and fact." *Groh v.*
> *Ramirez*, 540 U.S. 551 (2004) (Kennedy, J.,
> dissenting) (citing *Butz v. Economou*, 438
> U.S. 478, 507 (1978) (noting that qualified
> immunity covers "mere mistakes in judgment,
> whether the mistake is one of fact or one of
> law")).

> Because qualified immunity is "an immunity
> from suit rather than a mere defense to
> liability ... it is effectively lost if a
> case is erroneously permitted to go to
> trial." *Mitchell v. Forsyth*, 472 U.S. 511,
> 526 (1985) (emphasis deleted). Indeed, we
> have made clear that the "driving force"
> behind creation of the qualified immunity
> doctrine was a desire to ensure that
> "'insubstantial claims' against government
> officials [will] be resolved prior to
> discovery." *Anderson v. Creighton*, 483 U.S.
> 635, 640, n. 2 (1987). Accordingly, "we
> repeatedly have stressed the importance of
> resolving immunity questions at the earliest
> possible stage in litigation." Hunter v.
> Bryant, 502 U.S. 224, 227 (1991) (per
> curiam).

Deciding qualified immunity normally entails a two-step analysis.

1  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, "taken in the

2  light most favorable to the party asserting the injury, do the

3  facts alleged show the officers' conduct violated a

4  constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201

5  (2001).  If the court determines that the conduct did not violate

6  a constitutional right, the inquiry is over and the officer is

7  entitled to qualified immunity.  However, if the court determines

8  that the conduct did violate a constitutional right, *Saucier*'s

9  second prong requires the court to determine whether, at the time

10  of the violation, the constitutional right was "clearly

11  established."  *Id*.  "The relevant, dispositive inquiry in

12  determining whether a right is clearly established is whether it

13  would be clear to a reasonable officer that his conduct was

14  unlawful in the situation he confronted."  *Id*. at 202.  This

15  inquiry is wholly objective and is undertaken in light of the

16  totality of the specific factual circumstances of each case.  *Id*.

17  at 201.  Even if the violated right is clearly established,

18  *Saucier* recognized that, in certain situations, it may be

19  difficult for a police officer to determine how to apply the

20  relevant legal doctrine to the particular circumstances he faces.

21  If an officer makes a mistake in applying the relevant legal

22  doctrine, he is not precluded from claiming qualified immunity so

23  long as the mistake is reasonable.  If "the officer's mistake as

24  to what the law requires is reasonable, ... the officer is

25  entitled to the immunity defense."  *Id*. at 205.  In *Pearson*, the

26  Supreme Court ruled that "while the sequence set forth [in

1   *Saucier*] is often appropriate, it should no longer be regarded as

2   mandatory." *Pearson, id.* at 818.  "The judges of the district

3   courts and the courts of appeal should be permitted to exercise

4   their sound discretion in deciding which of the two prongs of the

5   qualified immunity analysis should be addressed first in light of

6   the circumstances in the particular case at hand." *Id.*    In

7   *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court

8   reiterated:

9           Qualified immunity shields an officer from
            suit when she makes a decision that, even if
10          constitutionally deficient, reasonably
            misapprehends the law governing the
11          circumstances she confronted.  *Saucier v.
            Katz*, 533 U.S., at 206 (qualified immunity
12          operates 'to protect officers from the
            sometimes "hazy border between excessive and
13          acceptable force"').  Because the focus is on
            whether the officer had fair notice that her
14          conduct was unlawful, reasonableness is
            judged against the backdrop of the law at the
15          time of the conduct.  If the law at that time
            did not clearly establish that the officer's
16          conduct would violate the Constitution, the
            officer should not be subject to liability
17          or, indeed, even the burdens of litigation.

18          It is important to emphasize that this
            inquiry 'must be undertaken in light of the
19          specific context of the case, not as a broad
            general proposition.'  *Id.*, at 201.  As we
20          previously said in this very context:

21              '[T]here is no doubt that *Graham v.
                Connor, supra*, clearly establishes
22              the general proposition that use of
                force is contrary to the Fourth
23              Amendment if it is excessive under
                objective standards of
24              reasonableness.  Yet, that is not
                enough.  Rather, we emphasized in
25              *Anderson* [*v. Creighton*] "that the
                right the official is alleged to
26              have violated must have been

                              83

'clearly established' in a more
particularized, and hence more
relevant, sense: The contours of
the right must be sufficiently
clear that a reasonable officer
would understand that what he is
doing violates that right.' ...
The relevant, dispositive inquiry
in determining whether a right is
clearly established is whether it
would be clear to a reasonable
officer that his conduct was
unlawful in the situation he
confronted.'  ...

The Court of Appeals acknowledged this
statement of law, but then proceeded to find
fair warning in the general tests set out in
*Graham* and *Garner* ... In so doing, it was
mistaken.  *Graham* and *Garner,* following the
lead of the Fourth Amendment's text, are cast
at a high level of generality.  See *Graham v.
Connor*, *supra*, at 396 ('"[T]he test of
reasonableness under the Fourth Amendment is
not capable of precise definition or
mechanical application"').  Of course, in an
obvious case, these standards can 'clearly
establish' the answer, even without a body of
relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of

Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom.*

*Scarrot v. Wilkins*, 543 U.S. 811 (2004):

Where the officers' entitlement to qualified
immunity depends on the resolution of
disputed issues of fact in their favor, and
against the non-moving party, summary
judgment is not appropriate.  *See Saucier*,
533 U.S. at 216 ... (Ginsberg, J.,
concurring)('Of course, if an excessive force
claim turns on which of two conflicting
stories best captures what happened on the
street, *Graham* will not permit summary
judgment in favor of the defendant
official.').

Defendant Sinclair argues that there is no law that clearly

84

establishes a violation of the ADA or Section 504 or any other federal law to contact the police when a student becomes completely unresponsive and fails to follow directions from school officials.

Plaintiff argues that Ninth Circuit precedent establishes clear limitations on a school officials discretion to punish a student.  Plaintiff argues that Defendant Sinclair's alleged conduct is comparable to the principal who taped a second-grader to a tree for failure to comply with a "time-out," *Doe ex rel. Doe*, *supra*, 334 F.3d 906, to the teacher who force-fed a disabled student food he was allergic to, *Witte*, *supra,* 197 F.3d at 1272-73, and to school officials who condoned the pepper-spraying and handcuffing of an autistic child, *Banks*, *supra*, 2005 WL 2233213. Plaintiff contends that "[s]uch actions shock the conscience and, especially at the pleading stage, support a violation of a clearly established right."   Plaintiff cites *Hydrick v. Hunter*, 500 F.3d 978, 988 (9th Cir.2007):

> But, the Plaintiffs need not establish that the Defendants' 'behavior had been previously declared unconstitutional.' ... Rather, if binding authority indicates that 'the disputed right existed, even if no case had specifically so declared,' the Defendants would be on notice of the right ... If the occasion has not risen for our circuit to reach a question, we may draw clearly established law from other circuits.

Defendant Sinclair replies that Plaintiff "stretches the bounds of credibility by arguing that the simple Act of notifying the police" is comparable to the facts in the cases cited by

1 Plaintiff.  Defendant Sinclair notes that there is no allegation

2 that she did anything other than contact the police.

3     The cases Plaintiff relies on are simply not comparable.

4 *Doe ex rel. Doe*, *supra*, 334 F.3d at 910, held:

5             We now address an alleged violation of a
              student's right to be free of excessive
6             physical punishment or restraint.  We
              observed in *Koch* that the right of a student
7             to be free from excessive force at the hands
              of teachers employed by the state was clearly
8             established as early as 1990.

9 Here, there is no allegation that Defendant Sinclair used any

10 force whatsoever on Plaintiff.  She merely threatened to and then

11 did, call the police.  District Defendants' motion to dismiss the

12 Seventh Cause of Action as to Defendant Sinclair on the ground of

13 qualified immunity from liability under Section 1983 is GRANTED

14 WITHOUT LEAVE TO AMEND.

15     C.   <u>DISTRICT DEFENDANTS' MOTION TO STRIKE</u>.

16     District Defendants move to strike the prayer for punitive

17 damages.

18     Plaintiff concedes that punitive damages are not available

19 against the School District.

20     Defendant Sinclair moves to strike the prayer for punitive

21 damages in connection with the Fourth Cause of Action for

22 intentional infliction of emotional distress.[4] Defendant Sinclair

23 _____

24     [4]District Defendants moved to strike the prayer for punitive
   damages against Defendant Sinclair in connection with the Seventh
25 Cause of Action for violation of Section 1983.  Because the Seventh
   Cause of Action is dismissed against Defendant Sinclair on the
26 ground of qualified immunity, this aspect of the motion to strike
   is moot.

relies on the Paul D. Coverdell Teacher Protection Act of 2001, 20 U.S.C. § 6731 *et seq.*, and specifically Section 6736(c)(1):

> Punitive damages may not be awarded against a teacher in an action brought for harm based on the Act or omission of a teacher acting within the scope of the teacher's employment or responsibilities to a school or governmental entity unless the claimant establishes by clear and convincing evidence that the harm was proximately caused by an Act or omission of such teacher that constitutes willful or criminal misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed.

Defendant Sinclair argues that the Complaint fails to plead any facts demonstrating her willful or criminal misconduct or conscious, flagrant indifference to the rights or safety of Plaintiff. Defendant Sinclair contends that the allegation in the Fourth Cause of Action that her decision to contact the police was done "maliciously, fraudulently, and oppressively, in bad faith, with the wrongful intent of injuring PLAINTIFF, and in conscious disregard to PLAINTIFF's rights" is insufficient because there are no facts "establishing anything of the kind."

Plaintiff responds that the facts of the Complaint, when read as a whole, establish the willful and conscious disregard of Plaintiff's rights necessary to support an award of punitive damages:

> Plaintiff pleads that Defendant Sinclair knew of Plaintiff's disability, knew how to handle it, and discriminatorily threatened Plaintiff with police intervention and caused the police to forcibly remove Plaintiff from school grounds ... Moreover, Plaintiff pleads there was absolutely no justification [for] Defendant Sinclair's harsh and extreme

87

> reaction as Plaintiff was merely sitting on a
> bench with his head down and posing no danger
> or threat to anyone ....

Plaintiff contends that the prayer for punitive damages arises from these allegations.

Defendant Sinclair replies by citing *Crawford-El* and contends that Plaintiff is required to plead "specific, nonconclusory allegations" that establish improper motive.

Whether Plaintiff is entitled to punitive damages against Defendant Sinclair in connection with the Fourth Cause of Action for intentional infliction of emotional distress.

District Defendants' motion to strike is GRANTED IN PART AND DENIED IN PART.

D. <u>CITY DEFENDANTS' MOTION TO DISMISS</u>.

1. <u>Qualified Immunity</u>.

Defendants McIntosh and Prock move to dismiss the Eighth Cause of Action for excessive force in violation of Section 1983 on the ground of qualified immunity. The Eighth Cause of Action alleges that Defendants McIntosh and Prock "subjected Plaintiff to unreasonable seizure of his person without reasonable or probable cause," that they "wrongfully caused Plaintiff to be restrained, arrested, confined, and/or detained, which amounted to a seizure of Plaintiff's person," and that they "intentionally effected this seizure of Plaintiff by use of unlawful and excessive force against him."

In so moving, Defendants assert:

> Here, Officer Prock was summoned to an

> elementary school and informed that a student
> was 'disruptive,' 'out of control' and might
> endanger himself by running into traffic.
> Thereafter Prock took plaintiff into custody,
> including handcuffing him, and drove him
> home.  These actions are reasonable.  These
> actions assured the plaintiff's safety.

Plaintiff objects that none of these facts are alleged in the Complaint and no declaration is provided to substantiate them.

The Court cannot rely on Defendants' factual representations in their motion to dismiss.  A motion to dismiss must be resolved on the allegations made in the Complaint.  All the Complaint alleges is that "Chief of Police Mace McIntosh, Officer Hall Prock, and Officer Bowly responded to Sonora Elementary School to respond to the report of the 'out of control' juvenile who was allegedly causing a disturbance at the school," and that "[u]pon locating C.B. on the school grounds, the police encountered C.B., an eleven year old student, who was not acting in any disruptive or disruly manner but rather sitting quietly on a bench with his head down."

Plaintiff argues that California and Ninth Circuit case law clearly indicate that handcuffing an otherwise lawfully detained individual, when that individual poses no flight risk or danger to officers, transforms the detention into an unlawful arrest and seizure.

Plaintiff cites *People v. Steier*, 168 Cal.App.4th 21 (2008), a criminal appeal in which the Court held that the defendant's consent to search after being handcuffed was not voluntary.  The

evidence established that the officer handcuffed a narcotics
suspect during a traffic stop because the suspect was four to
five inches taller than the officer and the officer felt
uncomfortable about the height differential even though the
suspect was very cooperative and docile.   The Court of Appeal
stated:

> Generally, handcuffing a suspect during a
> detention has only been sanctioned in cases
> where the police officer has a reasonable
> basis for believing the suspect poses a
> present physical threat or might flee ... The
> more specific the information an officer has
> about a suspect's identity, dangerousness,
> and flight risk, the more reasonable a
> decision to detain the suspect in handcuffs
> will be ... Circumstances in which
> handcuffing has been determined to be
> reasonably necessary for the detention
> include when: (1) the suspect is
> uncooperative; (2) the officer has
> information the suspect is currently armed;
> (3) the officer has information the suspect
> is about to commit a violent crime; (4) the
> detention closely follows a violent crime by
> a person matching the suspect's description
> and/or vehicle; (5) the suspect acts in a
> manner raising a reasonable possibility of
> danger or flight; or (6) the suspects
> outnumber the officers.

Plaintiff also cites *In re Antonio B.*, 166 Cal.App.4th 435,
442 (2008):

> Here, the officers detained appellant because
> he was walking with another teenager who was
> smoking marijuana, and they believed
> appellant might also have been smoking
> marijuana ... The officers outnumbered the
> suspects, one of who was in handcuffs
> incident to his valid arrest, there was no
> one else in the vicinity, and appellant did
> not attempt to flee.  In short, there was no
> evidence to suggest that the officers had any
> basis to believe that appellant posed a

> danger to them or that handcuffing him was
> necessary to effectuate the purpose of the
> stop, i.e., to determine whether appellant
> had been smoking marijuana.
>
> Detective Cepeida's 'policy' of handcuffing
> any suspect he detains for further
> investigation regardless of the circumstances
> of the stop ignores the constitutional
> directive that a detention based upon
> reasonable suspicion of criminal activity
> must be conducted using the least intrusive
> means reasonably available under the
> circumstances of that particular detention.
> Because the use of handcuffs on appellant
> during the stop was not warranted under the
> circumstances, the seizure constituted an
> arrest rather than a detention.  As there was
> no probable cause to arrest appellant at the
> time he was handcuffed, the arrest was
> illegal, and the consent to be searched,
> which on this record flowed directly from the
> illegal arrest, was not voluntary.
> Therefore, the evidence discovered must be
> suppressed.

*See also Washington v. Lambert*, 98 F.3d 1181, 1188 (9th

Cir.1996); *Baldwin v. Placer County*, 418 F.3d 966, 970 (9th

Cir.2005).

Plaintiff argues:

> This is a case where Plaintiff's disability
> caused him to remain seated on a school bench
> when his teacher wanted him to go inside the
> school building ... Rather than escorting
> Plaintiff inside the school building, two
> armed police officers handcuffed an eleven
> year old causing him pain, left the child in
> handcuffs on the playground in view of third
> parties, and kept Plaintiff in handcuffs as
> they forcibly removed him from school grounds
> and transported him in the back of a police
> cruiser ... While a line of California cases
> allow lawful investigatory detentions on
> school grounds pursuant to suspicious drug or
> weapon possession or trespassing, the
> allegations in these cases are inapposite the
> ones alleged in the instant action.

91

1                **Any reasonable officer would know that he**
                **could not lawfully place an elementary school**
2                **child in handcuffs when the child is doing**
                **nothing wrong, is legitimately present at**
3                **school as he is supposed to be, and is not**
                **suspected of having weapons nor drugs nor**
4                **threatening the safety of anyone in any way.**

5    **City Defendants reply that the cases upon which Plaintiff**

6 **relies are distinguishable because "Officer Prock was**

7 **transporting C.B. in a police vehicle where Mr. Prock is the only**

8 **officer available to drive the car, and no other officer is in**

9 **the vehicle to maintain control over C.B."  City Defendants**

10 **contend:**

11                **The transporting of suspects and detainees in**
                **police vehicles is a common-enough phenomenon**
12                **that if it were illegal to use handcuffs as a**
                **protective measure to ensure safe arrival,**
13                **there would be some known authority to**
                **support that position.  Plaintiff's counsel**
14                **has offered none.  And Defendants' counsel**
                **can find none.  For qualified immunity to be**
15                **rendered inapplicable, it must be self-**
                **evident that the acts, practices, or**
16                **omissions of the public officials were**
                **improper.  That element of Plaintiff's claim**
17                **finds no support in any known authority.**

18    **City Defendants' position is based on facts not alleged in**

19 **the Complaint.  It is unclear exactly when C.B. was handcuffed**

20 **and, as noted above, the information allegedly given the police**

21 **when they arrived is unknown, other than they were responding to**

22 **a report of an out of control student, is unknown.  Generally,**

23 **police vehicles have built into them barriers and restraints to**

24 **keep officers and their passengers safe, i.e., no inside door**

25 **handles in the back seat and a grill separating the passenger**

26 **seat from the front seat.  whether those were available on**

Officer Prock's vehicle is unknown.  Also unknown is why the
third officer, Bowly, did not accompany Officer Prock.
Plaintiff's counsel has filed a declaration in which she avers
that she can amend the Complaint to allege that Plaintiff was
restrained in handcuffs for over thirty minutes, that the
handcuffs hurt his wrists, that he was left handcuffed near a
ball box on the playground visible to staff, students and
passers-by, that Officer Prock told Plaintiff he had been a
police officer for many years and had never handcuffed an eleven
year old for doing nothing, and that three police cars responded
to the school, that, at the time he was handcuffed, he was
surrounded by four or more adults and located in a fenced-in area
of the school grounds.

City Defendants' motion to dismiss on the ground of
qualified immunity is DENIED WITHOUT PREJUDICE.  Plaintiff is
ordered to file an amended complaint setting forth the specific
facts regarding handcuffing upon which he relies in contending
that he was subjected to excessive force in violation of his
constitutional rights.

2.  Supervisor Liability.

City Defendants move to dismiss all causes of action against
Defendant McIntosh on the ground that he is not liable as a
supervisor.[5]

---

[5]Although City Defendants move to dismiss all causes of
action, their authority and analysis is limited to Section 1983.
They present no authority supporting dismissal of the causes of
action for false imprisonment, battery, and intentional infliction

1    In a Section 1983 action, *respondeat superior,* or vicarious

2   liability, may not be imposed in the absence of a state law

3   imposing such liability.  *Redman v. County of San Diego*, 942 F.2d

4   1435, 1446 (9th Cir.1991), *cert. denied*, 502 U.S. 1074 (1992).

5   However, "'[a] supervisor may be liable if there exists *either*

6   (1) his or her personal involvement in the constitutional

7   deprivation, *or* (2) a sufficient causal connection between the

8   supervisor's wrongful conduct and the constitutional violation.'"

9   *Id.*  "Supervisory liability exists even without overt personal

10  participation in the offensive Act if supervisory officials

11  implement a policy so deficient that the policy 'itself is a

12  repudiation of constitutional rights' and is 'the moving force of

13  the constitutional violation.'"  *Hansen v. Black*, 885 F.2d 642,

14  646 (9th Cir.1989).

15   Defendant McIntosh acknowledges the allegations in the

16  Complaint that he was present at the school and that he directed

17  Officer Prock to place Plaintiff in handcuffs.  Defendant argues

18  that, as contended above, none of the conduct of Officer Prock or

19  Defendant McIntosh resulted in a constitutional violation of

20  Plaintiff's rights, there can be no supervisory liability

21  attributed to Defendant McIntosh.

22   City Defendants' motion to dismiss on this ground is DENIED

23  WITHOUT PREJUDICE.  This ground for dismissal fails because

24  qualified immunity cannot be determined on the record before the

25  _____

26  of emotional distress.

94

1  Court.  City Defendants may, if they wish, renew this motion upon
2  the filing by Plaintiff of his amended complaint.

3          3.  *Monell* Liability.

4       The City of Sonora moves to dismiss on the ground that,
5  because the officers did not violate Plaintiff's constitutional
6  rights, there can be no *Monell* liability.

7       City Defendants' motion to dismiss on this ground is DENIED
8  WITHOUT PREJUDICE.  This ground for dismissal fails because
9  qualified immunity cannot be determined on the record before the
10 Court.  City Defendants may, if they wish, renew this motion upon
11 the filing by Plaintiff of his amended complaint.

12         4.  More Definite Statement.

13      City Defendants move for a more definite statement with
14 regard to the Complaint's allegations that the officers' actions
15 were malicious, oppressive, fraudulent and in bad faith are not
16 supported by specific facts.  City Defendants cite *Crawford-El v.*
17 *Britton*, 523 U.S. 574 (1998).

18      In *Crawford-El*, the Supreme Court held that a plaintiff
19 bringing a constitutional action against government officials for
20 damages, for which an official's improper motive is a necessary
21 element, need not adduce clear and convincing evidence of
22 improper motive in order to defeat an official's motion for
23 summary judgment.  The Supreme Court then stated:

24             Though we have rejected the Court of Appeals'
               solution, we are aware of the potential
25             problem that troubled the court.  It is
               therefore appropriate to add a few words on
26             some of the existing procedures available to

> federal trial judges in handling claims that involve examination of an official's state of mind.
>
> When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense.  It must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings.  The district judge has two primary options prior to permitting any discovery at all.  First, the court may order a reply to the defendant's or a third party's answer under Federal Rule of Civil Procedure 7(a), or grant the defendant's motion for a more definite statement under Rule 12(e).  Thus, the court may insist that a plaintiff 'put forward specific, nonconclusory factual allegations' that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment ... This option exists even if the official chooses not to plead the affirmative defense of qualified immunity.  Second, if the defendant does plead the immunity defense, the district court should resolve that threshold question before permitting discovery ... To do so, the court must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law.  Because the former option of demanding more specific allegations of intent places no burden on the defendant-official, the district judge may choose that alternative before resolving the immunity question, which sometimes requires complicated analysis of legal issues.

523 U.S. at 597-598.

City Defendants' motion for more definite statement is

DENIED WITHOUT PREJUDICE.  City Defendants may, if they wish,

renew this motion upon the filing by Plaintiff of his amended

1  complaint.

2                              **CONCLUSION**

3       For the reasons stated:

4       1.   District Defendants' motion to dismiss is GRANTED IN

5  PART WITH LEAVE TO AMEND, GRANTED IN PART WITHOUT LEAVE TO AMEND,

6  AND DENIED IN PART;

7       2.   District Defendants' motion to strike is GRANTED IN PART

8  AND DENIED IN PART;

9       3.   City Defendants' motion to dismiss is DENIED WITHOUT

10  PREJUDICE;

11       4.   Plaintiff shall file a First Amended Complaint in

12  accordance with the rulings in this Memorandum Decision and Order

13  within 30 days of the filing date of this Memorandum Decision and

14  Order.

15  IT IS SO ORDERED.

16  Dated:   __September 21, 2009__            _____/s/ Oliver W. Wanger_____
                                              UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26