IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.B., a minor, | No. CV-F-09-285 OWW/DLB |
| | |
| | MEMORANDUM DECISION DENYING |
| | DEFENDANTS' CITY OF SONORA, |
| Plaintiff, | CHIEF OF POLICE MACE |
| | McINTOSH AND OFFICER HAL |
| vs. | PROCK'S MOTION TO DISMISS |
| | FIRST AMENDED COMPLAINT AND |
| | FOR MORE DEFINITE STATEMENT |
| SONORA SCHOOL DISTRICT, | (Doc. 58) |
| et al., | |
| | |
| Defendants. | |

Before the Court is the motion of Defendants City of Sonora, Chief of Police Mace McIntosh and Officer Hal Prock's motion to dismiss the First Amended Complaint ("FAC") and for a more definite statement.[1]

Plaintiff filed the FAC pursuant to the Memorandum Decision filed on September 22, 2009 ("September 22 Memorandum Decision"). As "Facts Common to All Causes of Action," the FAC alleges:

---

[1]Plaintiff and Defendants Sonora School District and Karen Sinclair have settled this action.

9) In the 2007-2208 school year, minor C.B. was enrolled as a 6th grade student at Sonora Elementary School in the Sonora School District.

10) C.B. suffers from disabilities, namely a mood disorder and attention deficit hyperactivity disorder ... At all times relevant to the complaint, SONORA SCHOOL DISTRICT knew of C.B.'s disabilities and had in fact placed C.B. on an Individualized Education Plan and section 504 plan.

11) C.B.'s IEP and section 504 plans at Sonora Elementary School included specific behavioral interventions to be followed in the event that C.B. 'shut down' or became unresponsive to school staff due to his mood disorder.  A 'shut down' meant that C.B. would simply freeze in place and not do anything.  He would remain calm during 'shut downs' and typically would not speak.  C.B. would never make any movements that were aggressive or physically threatening in any way during a 'shut down.'  He would typically cross his arms and keep his head down or just stand still.

...

13) On or about September 29, 2008, C.B. allegedly experienced an episodes [sic] in which he 'shut down' and became unresponsive to school staff.  C.B. allegedly sat down on a bench in the fenced in playground and folded his arms across his chest and lowered his head so as to not make eye contact with anyone.  The staff at Sonora Elementary School failed to follow C.B.'s IEP and section 504 plan for behavioral intervention and failed to contact C.B.'s parents or designated relatives or friends to assist with C.B.

14) Due to C.B.'s disabilities and despite the plans put in place to accommodate these disabilities, KAREN SINCLAIR, a specialist employed by Sonora Elementary School, threatened C.B. that if he did not do as she instructed, she would call the police. SINCLAIR did in fact instruct a school

2

receptionist to call the City of Sonora
Police Department for intervention with an
out of control juvenile.

15) On or about September 29, 2008, Chief of
Police MACE MCINTOSH, Officer HAL PROCK, and
Officer Bowly responded to Sonora Elementary
School to respond to the report of the 'out
of control' juvenile who was allegedly
causing a disturbance at the school.

16) Upon locating C.B. on the school grounds,
the police officers observed C.B. to be an
eleven year old student, who was not acting
in any disruptive nor unruly manner but
rather sitting quietly on a playground bench
with his head down.  One or more of the
officers made contact with C.B. and found him
to be calm and cooperative.  C.B. did not act
agitated in any way.  None of the officers
observed any conduct on the part of C.B.
which gave them probable cause to take C.B.
into custody nor which gave them any reason
to believe that C.B. posed a threat to the
safety of anyone.  When Officer Hal Prock
asked C.B. to stand up from the bench, C.B.
complied with the Officer's instruction.

17) Despite the fact that C.B. posed no
threat to anyone and despite the fact there
was no probable cause to take C.B. into
custody, Chief of Police MACE MCINTOSH
directed Officer HAL PROCK to handcuff C.B.
At the time the officers decided to handcuff
the eleven year old, he was located in a
fenced in playground with only one means of
exit.  Also, the eleven year old Plaintiff
was surrounded by the officers and at least
two other adults.  A Sonora School District
staff member who was present asked the
officers if it was really necessary to
handcuff an eleven year old.

18) The Chief of Police told the Sonora
School District staff member that it was
protocol to handcuff the eleven year old C.B.
even though the Sonora Police Department's
Handcuff Policy 354 clearly states 'Juveniles
under 14 years of age generally will not be
handcuffed unless their acts have amounted to
a dangerous felony or whey they are of a

3

state of mind which suggests a reasonable probability of their desire to escape, injure themselves, the officer or to destroy property.'   In addition, Sonora Police Department Handcuff Policy 354 clearly states that handcuffing is a discretionary procedure and that 'the arresting officer should consider the circumstances leading to the arrest, the attitude of the arrested person, and the age, sex, and health of the person before handcuffing.'

19) Despite the fact that the officers observed that Plaintiff was calm and cooperative and, despite the fact that Plaintiff was in an enclosed area and surrounded by at least four adults, the officers forcibly handcuffed Plaintiff while he was on the playground.  Officer Prock tightly handcuffed Plaintiff thereby causing his wrists to be hurt and injured.  Officer Prock then left Plaintiff C.B. standing with his hands handcuffed tightly behind his back on the playground while he went to pull a police car around closer to the side of the school building.  Officer Prock left the eleven year old Plaintiff in handcuffs (in full view of the public) even though at least three adults including the Chief of Police remained with C.B. in the playground area.

20) Officer Hal Prock then placed the Plaintiff child, who was still tightly handcuffed, in the backseat of a City of Sonora police car.  The police car was equipped with all usual safety equipment, including a grate between the front and back seats and locking back doors which could not be opened by the back seat passenger (in this case an eleven year old child).

21) Officer Hal Prock kept Plaintiff in handcuffs in the back seat of the police vehicle for a half an hour drive to Jamestown, California, where he left the child in the custody of his uncle, Mark [sic] Banks.  During the trip to Jamestown, Officer Hal Prock told Plaintiff C.B. he had been a police officer for eleven years and had never had to handcuff an eleven year old for doing nothing.

4

...

23) Sonora Elementary School gave the City of Sonora police officers a packet of contact information for Plaintiff C.B.'s parents and Uncle, Matt [sic] Banks.  At no time did the referenced City of Sonora employees have the permission of C.B. nor his parents to transport C.B. or to cause C.B. to be transported by anyone other that C.B.'s parents and emergency contacts.  In fact, when Officer Prock called C.B.'s Uncle, Matt [sic] Banks, the uncle informed Officer Prock that the School had an established protocol for dealing with any situations involving C.B. and that the protocol was not being followed.

The FAC alleges causes of action for false imprisonment (Second Cause of Action), battery (Third Cause of Action), intentional infliction of emotional distress (Fourth Cause of Action) , excessive force in violation of 42 U.S.C. § 1983 (Eighth Cause of Action), and *Monell* liability (Ninth Cause of Action).

Defendants move to dismiss these causes of action for failure to state a claim upon which relief can be granted.  Alternatively, Defendants move for a more definite statement.

A.   MOTION TO DISMISS

1.   Governing Standards.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the complaint.  *Novarro v. Black*, 250 F.3d 729, 732 (9th Cir.2001).  Dismissal is warranted under Rule 12(b)(6) where the complaint lacks a cognizable legal theory or where the complaint presents a cognizable legal theory yet fails to plead essential facts under that theory.  *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir.1984).  In reviewing a

motion to dismiss under Rule 12(b)(6), the court must assume the truth of all factual allegations and must construe all inferences from them in the light most favorable to the nonmoving party. *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002). However, legal conclusions need not be taken as true merely because they are cast in the form of factual allegations. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1200 (9th Cir.2003). "A district court should grant a motion to dismiss if plaintiffs have not pled 'enough facts to state a claim to relief that is plausible on its face.'" *Williams ex rel. Tabiu v. Gerber Products Co.,* 523 F.3d 934, 938 (9th Cir.2008), quoting *Bell Atlantic Corp. v. Twombley*, 550 U.S. 544, 570 (2007). "'Factual allegations must be enough to raise a right to relief above the speculative level.'" *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, *id.* at 555. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* at 556. The plausibility standard is not akin to a "probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully, *Id.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops

short of the line between possibility and plausibility of
'entitlement to relief.'" *Id.* at 557.   In *Ashcroft v. Iqbal*, ___
U.S. ___, 129 S.Ct. 1937 (2009), the Supreme Court explained:

> Two working principles underlie our decision
> in *Twombley*.   First, the tenet that a court
> must accept as true all of the allegations
> contained in a complaint is inapplicable to
> legal conclusions.   Threadbare recitations fo
> the elements of a cause of action, supported
> by mere conclusory statements, do not suffice
> ... Rule 8 marks a notable and generous
> departure from the hyper-technical, code-
> pleading regime of a prior era, but it does
> not unlock the doors of discovery for a
> plaintiff armed with nothing more than
> conclusions.   Second, only a complaint that
> states a plausible claim for relief survives
> a motion to dismiss ... Determining whether a
> complaint states a plausible claim for relief
> will ... be a context-specific task that
> requires the reviewing court to draw on its
> judicial experience and common sense ... But
> where the well-pleaded facts do not permit
> the court to infer more than the mere
> possibility of misconduct, the complaint has
> alleged - but it has not 'show[n]' - 'that
> the pleader is entitled to relief.' ....
>
> In keeping with these principles, a court
> considering a motion to dismiss can choose to
> begin by identifying pleadings that, because
> they are no more than conclusions, are not
> entitled to the assumption of truth.   While
> legal conclusions can provide the framework
> of a complaint, they must be supported by
> factual allegations.   When there are well-
> pleaded factual allegations, a court should
> assume their veracity and then determine
> whether they plausibly give rise to an
> entitlement to relief.

Immunities and other affirmative defenses may be upheld on
a motion to dismiss only when they are established on the face of
the complaint.   *See Morley v. Walker*, 175 F.3d 756, 759 (9th
Cir.1999); *Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th

Cir. 1980)  When ruling on a motion to dismiss, the court may consider the facts alleged in the complaint, documents attached to the complaint, documents relied upon but not attached to the complaint when authenticity is not contested, and matters of which the court takes judicial notice.  *Parrino v. FHP, Inc*, 146 F.3d 699, 705-706 (9th Cir.1988).

2.  <u>Qualified Immunity</u>.

Defendants move to dismiss the Eighth Cause of Action on the ground that the individual defendants are entitled to qualified immunity from liability for damages under Section 1983.

The Eighth Cause of Action, after incorporating all preceding allegations, alleges that Defendants McIntosh and Prock "subjected Plaintiff to unreasonable seizure of his person without reasonable or probable cause," "wrongfully caused Plaintiff to be restrained, arrested, confined and/or detained, which amounted to a seizure of Plaintiff's person," "intentionally effected this seizure of Plaintiff by use of unlawful and excessive force against him, a minor child at the time," that the "force used by Defendant officers against Plaintiff was not objectively reasonable under the circumstances," and that Plaintiff was physically and emotionally harmed thereby.

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v.*

8

*Fitzgerald*, 457 U.S. 800, 818 (1982).  In *Pearson v. Callahan*, ___ U.S. ___, 129 S. Ct. 808 (2009), the Supreme Court summarized the purpose of qualified immunity:

> Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551 (2004) (Kennedy, J., dissenting) (citing *Butz v. Economou*, 438 U.S. 478, 507 (1978) (noting that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law")).

> Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis deleted). Indeed, we have made clear that the "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." *Anderson v. Creighton*, 483 U.S. 635, 640, n. 2 (1987). Accordingly, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (per curiam).

Deciding qualified immunity normally entails a two-step analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a

constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity. However, if the court determines that the conduct did violate a constitutional right, *Saucier*'s second prong requires the court to determine whether, at the time of the violation, the constitutional right was "clearly established." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. This inquiry is wholly objective and is undertaken in light of the totality of the specific factual circumstances of each case. *Id*. at 201. Even if the violated right is clearly established, *Saucier* recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faces. If an officer makes a mistake in applying the relevant legal doctrine, he is not precluded from claiming qualified immunity so long as the mistake is reasonable. If "the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense." *Id*. at 205. In *Pearson*, the Supreme Court ruled that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson, id.* at 818. "The judges of the district courts and the courts of appeal should be permitted to exercise

10

their sound discretion in deciding which of the two prongs of the

qualified immunity analysis should be addressed first in light of

the circumstances in the particular case at hand." *Id.*   In

*Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court

reiterated:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier v. Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the sometimes "hazy border between excessive and acceptable force"'). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.
>
> It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' *Id.*, at 201. As we previously said in this very context:
>
> > '[T]here is no doubt that *Graham v. Connor, supra*, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness. Yet, that is not enough. Rather, we emphasized in *Anderson* [*v. Creighton*] "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable officer would understand that what he is

> doing violates that right.' ...
> The relevant, dispositive inquiry
> in determining whether a right is
> clearly established is whether it
> would be clear to a reasonable
> officer that his conduct was
> unlawful in the situation he
> confronted.' ...
>
> The Court of Appeals acknowledged this
> statement of law, but then proceeded to find
> fair warning in the general tests set out in
> *Graham* and *Garner* ... In so doing, it was
> mistaken.  *Graham* and *Garner*, following the
> lead of the Fourth Amendment's text, are cast
> at a high level of generality.  See *Graham v.
> Connor*, *supra*, at 396 ('"[T]he test of
> reasonableness under the Fourth Amendment is
> not capable of precise definition or
> mechanical application"').  Of course, in an
> obvious case, these standards can 'clearly
> establish' the answer, even without a body of
> relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of
Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom.
Scarrot v. Wilkins*, 543 U.S. 811 (2004):

> Where the officers' entitlement to qualified
> immunity depends on the resolution of
> disputed issues of fact in their favor, and
> against the non-moving party, summary
> judgment is not appropriate.  *See Saucier*,
> 533 U.S. at 216 ... (Ginsberg, J.,
> concurring)('Of course, if an excessive force
> claim turns on which of two conflicting
> stories best captures what happened on the
> street, *Graham* will not permit summary
> judgment in favor of the defendant
> official.').

Defendants argue that this action should be dismissed before
discovery in order to preclude expenditure of significant time
and money:

> The Supreme Court holds that qualified
> immunity is designed to prevent exactly that.

> Even premised upon the skeletal and selective
> facts proffered by plaintiff in its [sic]
> Amended Complaint, defendants are entitled to
> qualified immunity.  In the interest of
> justice and in furtherance of the explicit
> intent of the United States Supreme Court
> this Court should dismiss this matter at this
> juncture.

Defendants argue that qualified immunity has been established in connection with the detention and handcuffing of Plaintiff and his transportation by Officer Prock in the police vehicle to Plaintiff's uncle's home.

Defendants argue that Officer Prock's conduct in handcuffing Plaintiff was objectively reasonable under the circumstances because Officer Prock was summoned to the school and informed that Plaintiff was "disruptive" and "out of control":

> In contrast, had the juvenile not been
> handcuffed and proceeded to injure himself in
> the police car or while otherwise in custody,
> Officer Prock would now presumably face
> whether such hypothesized conduct was
> reasonable in light of the fact that Prock
> was informed that the juvenile was 'out of
> control' and 'disruptive.'

Defendants further argue that, even if Officer Prock's conduct was not reasonable, he is entitled to qualified immunity because his conduct would have been the result of mistaken judgment made in good faith and not a knowing violation of the law:

> In the absence of legal authority holding
> that an officer may not lawfully handcuff a
> detainee in this situation, defendants are
> entitled to dismissal of Plaintiff's
> Complaint.  Officer Prock made an objectively
> reasonable decision to handcuff the
> plaintiff.  Officer Prock knew plaintiff had
> been out of control and disruptive at school,
> and his disruptive misconduct was of the

magnitude where it had become necessary for
the school to call the police to remove him.

Plaintiff does not dispute that Defendants had a right to come to the school to investigate the report of an allegedly "out of control" and "disruptive" student.  However, after Defendants arrived at the school, Plaintiff argues that the decision to handcuff Plaintiff violated Plaintiff's Fourth Amendment rights because, based on the allegations of the FAC, Plaintiff was no longer acting in an out of control or disruptive manner. Plaintiff relies on *Gray ex rel. Alexander v. Bostic*, 458 F.3d 1295 (11th Cir.2006), *cert. denied*, 550 U.S. 956 (2007), as authority for his position.

In *Bostic,* an elementary school student brought a Section 1983 action against a deputy sheriff who served as a school resource officer (SRO), the sheriff, and others, arising from the detention and handcuffing of the student during a physical education class.  The Eleventh Circuit affirmed the District Court's denial of defendants' motion for summary judgment on the ground of qualified immunity.  In *Bostic,* a p.e. coach believed that Gray was not doing jumping jacks with the class; when Gray failed to comply with the coach's order that she do so, the coach told her to come to the wall; when Gray did so, she allegedly told the coach that she punch or hit the coach; although Gray denied that she stated she would punch or hit the coach, she did not dispute that she would do something physical to the coach. Deputy Bostic witnessed the exchange between the coach and Gray.

14

Deputy Bostic escorted Gray from the gym, told Gray to turn

around and placed her in handcuffs.  Gray stood with the

handcuffs on for five minutes.  On appeal, the student, Gray,

argued that Deputy Bostic used excessive force in detaining her

because he lacked a right to detain her at all.  458 F.3d at

1304.  The Eleventh Circuit applied the reasonableness standard

articulated in *New Jersey v. T.L.O.,* 469 U.S. 325, 341-342

(1985), to school seizures by law enforcement officers:

> In *T.L.O.*, the Supreme Court recognized that
> the substantial need to maintain discipline
> in the classroom and foster a positive
> learning environment 'requires some
> modification of the level of illicit activity
> needed to justify a search' in the public
> school setting.'  *T.L.O.*, 469 U.S. at 340 ...
> To that end, the Supreme Court concluded that
> 'the accommodation of the privacy interests
> of schoolchildren with the substantial need
> of teachers and administrators for freedom to
> maintain order in the schools does not
> require strict adherence to the requirement
> that searches be based on probable cause.'
> *Id.* at 341 ... Instead, under *T.L.O.*'s
> reasonableness standard, 'the legality of a
> search of a student should depend simply on
> the reasonableness, under all the
> circumstances, of the search.'  *Id.*  Under
> the *T.L.O.* standard, the reasonableness of
> the search is evaluated using a two-step
> inquiry: 'first, one must consider "whether
> the ... action was justified at its
> inception"; second, one must determine
> whether the search as actually conducted "was
> reasonably related in scope to the
> circumstances which justified interference in
> the first place."'  *Id.* at 341 ... The *T.L.O.*
> standard mirrors the standard announced in
> *Terry v. Ohio* governing the reasonableness of
> investigatory stops.  *See Terry v. Ohio*, 392
> U.S. 1, 20 ... (1988).

The Eleventh Circuit ruled that, because Deputy Bostic witnessed

Gray's threat in a school setting, stopping Gray to question her

about her conduct was reasonable.   *Id.* at 1305.   The Eleventh

Circuit then ruled:

> Turning to *T.L.O.*'s second prong, we must
> consider whether Deputy Bostic's subsequent
> handcuffing of Gray 'was reasonably related
> to the scope of the circumstances which
> justified the intervention in the first
> place.'   *T.L.O.,* 469 U.S. at 314 ... '[A
> seizure] will be permissible in its scope
> when the measures adopted are reasonably
> related to the objectives of the [seizure]
> and not excessively intrusive in light of the
> age and sex of the student and the nature of
> the infraction.'   *Id.* at 342... After
> stopping Gray, Deputy Bostic not only
> questioned her, but also handcuffed her for
> not less than five minutes.   Thus, the
> question under the second prong is whether
> the handcuffing of nine-year-old Gray was
> reasonably related to the scope of the
> circumstances which justified Deputy Bostic's
> initial interference and was not excessively
> intrusive.
>
> By his own admission, Deputy Bostic did not
> handcuff Gray to effect an arrest of Gray.
> Rather, his handcuffing of Gray was during an
> investigatory stop.   Nonetheless, during an
> investigatory stop, an officer can still
> handcuff a detainee when the officer
> reasonably believes that the detainee
> presents a potential threat to safety ....
>
> The problem in this case for Deputy Bostic is
> that, at the time Deputy Bostic handcuffed
> Gray, there was no indication of a potential
> threat to anyone's safety.   The incident was
> over, and Gray, after making the comment, had
> promptly complied with her teachers'
> instructions, coming to the gym wall and then
> to Coach Horton when told to do so.   There is
> no evidence that Gray was gesturing or
> engaging in any further disruptive behavior.
> Rather, Gray had cooperated with her teachers
> and did not pose a threat to anyone's safety.
> In fact, Coach Horton had insisted that she
> would handle the matter, but Deputy Bostic

still intervened.  Deputy Bostic does not
even claim that he handcuffed Gray to protect
his or anyone's safety.  Rather, Deputy
Bostic candidly admitted that he handcuffed
Gray to persuade her to get rid of her
disrespectful attitude and to impress upon
her the serious nature of committing crimes.
In effect, Deputy Bostic's handcuffing of
Gray was his attempt to punish Gray in order
to change her behavior in the future.

Thus, Deputy Bostic's handcuffing Gray was
not reasonably related to the scope of the
circumstances that justified the initial
investigatory stop.  Rather, the handcuffing
was excessively intrusive given Gray's young
age and the fact that it was not done to
protect anyone's safety.  Therefore, the
handcuffing of Gray violated Gray's Fourth
Amendment rights.

458 F.3d at 1305-1306.  The Eleventh Circuit then addressed

whether Deputy Bostic's violation of Gray's Fourth Amendment

rights violated a clearly established constitutional right:

It is well settled that, under the Fourth
Amendment, '[t]he scope of a detention must
be carefully tailored to its underlying
justification' and that the 'investigatory
methods employed [during a detention] should
be the least intrusive means reasonably
available to verify or dispel the officer's
suspicion in a short period of time.' *Florida
v. Royer*, 460 U.S. 491, 500 ... (1983).  As
we have already discussed, this Court has
long concluded that it is reasonable for
officers to use handcuffs to protect
themselves during an investigative detention
... However, Gray does not cite and we cannot
locate a case addressing before today when it
may be reasonable to use handcuffs in an
investigatory stop absent a safety rationale.
Thus, no factually similar pre-existing case
law put Deputy Bostic on notice that his use
of handcuffs to discipline Gray was
objectively unreasonable under the Fourth
Amendment.

However, our inquiry does not end here.  Even

17

in the absence of factually similar case law, an official can have fair warning that his conduct is unconstitutional when the constitutional violation is obvious, sometimes referred to as 'obvious clarity' cases. *See United States v. Lanier,* 520 U.S. 250, 271 ... (1997)('[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] been previously held unlawful.' ...).

The Fourth Amendment's general prescription against 'unreasonable' seizures seldom puts officers on notice that certain conduct is unlawful under precise circumstances ... Nonetheless, on rare occasions we have concluded that general Fourth Amendment principles make the constitutional violation obvious ... In these cases, the officer's conduct at issue lay 'so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [him] notwithstanding the lack of [fact-specific] case law.' ... Put another way, the officer's conduct in these cases was 'well beyond the "hazy border" that sometimes separates lawful conduct from unlawful conduct,' such that every objectively reasonable officer would have known that the conduct was unlawful ....

We likewise conclude that Deputy Bostic's conduct in handcuffing Gray, a compliant, nine-year-old girl for the sole purpose of punishing her was an obvious violation of Gray's Fourth Amendment rights.  After making the comment, Gray had complied with her teachers' and Deputy Bostic's instructions.  Indeed, one of the teachers had informed Deputy Bostic that she would handle the matter.  In addition, Deputy Bostic's purpose in handcuffing Gray was not to pursue an investigation to confirm or dispel his suspicions that Gray had committed a misdemeanor.  Rather, Deputy Bostic's purpose in handcuffing Gray was simply to punish her and teach her a lesson.  Every reasonable officer would have known that handcuffing a compliant nine-year-old for purely punitive

18

> reasons is unreasonable.  We emphasize that
> the Court is not saying that the use of
> handcuffs during an investigatory stop of a
> nine-year-old is always unreasonable, but
> just unreasonable under the particular facts
> of this case.

458 F.3d at 1307.

Plaintiff asserts that two facts which raise the level of intrusiveness of an investigatory seizure are the use of handcuffs and the detention of a suspect in a police vehicle, citing *Bennett v. City of Eastpointe*, 410 F.3d 810, 836-840 (6th Cir.2005).

In *Bennett*, African-American bicycle riders who were stopped by police brought a Section 1983 action alleging Fourth Amendment violations.  The Sixth Circuit addressed qualified immunity from liability when the youths were handcuffed and detained in the back of the police car during the *Terry* stop:

> A *Terry* stop cannot be excessively intrusive
> and must be reasonably related in scope and
> duration to the purposes of the investigation
> ... 'When establishing that a detention,
> which was not supported by probable cause,
> was reasonable, the government must
> demonstrate that the detention and
> investigative methods used were reasonable
> under the circumstances.' ... The 'scope of
> the intrusion permitted' in the course of a
> *Terry* stop 'will vary ... with the particular
> facts and circumstances of each case,' but in
> all cases the 'detention must be temporary
> and last no longer than is necessary' and
> 'the investigative methods employed should be
> the least intrusive means reasonably
> available to verify or dispel the officer's
> suspicion in a short period of time.' ....
>
> 'The use of handcuffs is the use of force,
> and such force must be objectively reasonable
> under the circumstances.' ... Consequently,

19

this Court has held that '[d]uring a *Terry*
stop, officers may draw their weapons or use
handcuffs 'so long as circumstances warrant
that precaution.' ....

With this principle applied to the facts of
this incident, we easily conclude that
handcuffing the youths violated their Fourth
Amendment rights.  We previously concluded
that the pat-down searches of the youths
violated their Fourth Amendment rights
because the officers had no reasonable belief
that the youths were armed and dangerous.  In
any event, the officers did conduct pat-down
searches, and uncovered no weapons or
anything else to warrant further concern for
their safety.  That makes it truly remarkable
(not in a good way) that the officers then
handcuffed the youths.  In addition to the
fact that the officers had no reasonable
belief that the youths were armed and
dangerous, they have alleged no facts that
would indicate that the youths attempted to
flee or do anything else that would warrant
this use of force.  In sum, we see no
circumstances here warranting the use of
handcuffs as a precaution for officer safety
or otherwise and therefore conclude that the
use of handcuffs during this *Terry* stop
violated the plaintiffs' Fourth Amendment
rights.

Plaintiff also cites *Tekle v. United States*, 511 F.3d 839,
(9th Cir.2007).  In *Tekle*, a team of twenty-three federal law
enforcement agents executed search and arrest warrants for
Tekle's parents, suspected of narcotics trafficking and tax-
related offenses.  When the officers executed the warrants, the
mother told the officers that her eleven-year-old son was in the
garage.  When the officers opened the garage, the officers told
Tekle to put his hands up.  Tekle did not realize the officers
were addressing him and turned to run into the house.  The
officers again told Tekle to turn around with his hands up.

Tekle turned around and started walking out of the garage with his hands up.  One of the officers told Tekle to get on the ground, so he lay face down on the driveway.  The officer held a gun to Tekle's head, searched him and handcuffed him.  The officer lifted Tekle from behind by the chain of the handcuffs and took him out to the sidewalk, where Tekle sat, still handcuffed, until his father was brought out of the house, approximately fifteen minutes later.  After the father was brought out, the officers removed the handcuffs from Tekle.  On the issue of qualified immunity, the Ninth Circuit ruled:

> Tekle was barefoot, unarmed, clad in shorts and a t-shirt, and appeared to be approximately twelve years old.  He was alone, and there were twenty-three armed officers.  He as not resisting the officers but was lying face down on the ground with his arms stretched in front of him.  Moreover, the officers had already searched Tekle and 'uncovered no weapons or anything else to warrant further concern for their safety.' *Bennett v. City of Eastpointe*, 410 F.3d 810, 837 (6th Cir.2005).  Yet Tekle remained handcuffed for fifteen to twenty more minutes, and an officer allegedly lifted him from behind by the chain of the handcuffs.  We conclude that a reasonable jury could find that the officers' use of handcuffs rendered Tekle's detention unreasonable.  *Cf. id.* (concluding that the use of handcuffs during a stop pursuant to *Terry v. Ohio* ... violated the Fourth Amendment rights of the plaintiffs, described as 'youths,' because the officers had conducted pat-down searches and uncovered no weapons and the officers had no reason to believe the youths were dangerous or would flee).  We accordingly turn to whether it would be clear to a reasonable officer that his conduct was unlawful in light of existing law ...

We stated in *Meredith* that, as of July 10, 1998, 'it was not clearly established in this (or any other) circuit that simply handcuffing a person and detaining her in handcuffs during a search for evidence would violate her Fourth Amendment rights.' *Meredith*, 342 F.3d at 1063.  None of the plaintiffs in *Meredith*, however, as an eleven-year-old child.

Moreover, in *Franklin*, we stated that detentions of children raise particular concerns that must be assessed with other circumstances.  *Franklin*, 31 F.3d at 876. The Seventh Circuit's decision in *McDonald*, relying in part on the fact that the plaintiff was a child, was decided in 1992. *See McDonald*, 966 F.2d at 295; *see also Ikerd*, 101 F.3d at 435 (a Fifth Circuit case decided in 1996) also involving the use of excessive force against a child); *Baker*, 50 F.3d at 1193 (a Third Circuit case, deciding in 1995 that the use of guns and handcuffs during a twenty-five minute detention of seventeen and fifteen-year old children supported a finding that their constitutional rights were violated.).  The totality of the circumstances supports the conclusion that not only was Tekle's detention unreasonable, but a reasonable officer would have known that an eleven-year-old child who was unarmed, barefoot, vastly outnumbered, and was not resisting arrest or attempting to flee should not have been kept in handcuffs for fifteen to twenty additional minutes.

511 F.3d at 850.

Defendants argue that *Tekle* is not controlling because there "is no claim that Officer Prock prolonged the detention, or that he did anything except place the plaintiff in handcuffs and transport him in a police vehicle to his uncle."

Plaintiff argues that Defendants' attempted distinction of *Tekle* is without merit: "It is 9th Circuit law that the need for force must be weighed against the force used, and minor children

who are cooperating with and outnumbered by police pose, at best, a minimal need for force."

Defendants are not entitled to dismissal of the alleged violations of the Fourth Amendment based on the handcuffing of Plaintiff and transporting him while handcuffed to his uncle's home.  According to the allegations of the FAC, Plaintiff became unresponsive to school staff, sat down on a  bench in the school playground, folded his arms on his chest, and refused to make eye contact.  Although the FAC alleges that the police were told by school staff that Plaintiff was an "'out of control' juvenile who was ... causing a disturbance at the school," when the officers arrived, Plaintiff was allegedly sitting on the bench with his head down.  The FAC alleges that when the officers made contact with Plaintiff, he was calm and cooperative and complied with instructions to stand up from the bench.  It is alleged that Plaintiff was surrounded by three police officers and two other adults and that, when asked why Plaintiff was being handcuffed, the Chief of Police responded that it was protocol to do so. There is nothing in these allegations allowing an inference that Plaintiff posed a danger to anyone or that Plaintiff would flee the school.  The FAC alleges that Defendants were provided with Plaintiff's contact information in his IEP.  Given these allegations and the case authority cited above, it is arguable that the handcuffing of Plaintiff violated his Fourth Amendment rights and, at the time of the violation, the constitutional right was clearly established.

1    Defendants' motion to dismiss the Eighth Cause of Action on

2 the basis of qualified immunity from liability is DENIED.

3    **3.   _Monell_ Liability.**

4    Defendants move to dismiss the Ninth Cause of Action against

5 Defendant City of Sonora for failure to state a claim upon which

6 relief can be granted.

7    After incorporating all preceding allegations, the Ninth

8 Cause of Action alleges:

> **80) Defendant CITY OF SONORA, through and by
> its police department, maintained a practice
> which resulted in the section 1983 excessive
> force damages alleged above in cause of
> action eight against CHIEF OF POLICE MACE
> MCINTOSH and OFFICER HAL PROCK.**

> **81) Despite the fact the Sonora Police
> Department written Handcuffing Policy 354
> counsels against handcuffing children who are
> under the age of 14, the CITY OF SONORA
> Police Department maintained a practice of
> violating this written policy and handcuffing
> all persons detained, whether or not arrested
> for any crime, regardless of their age and
> regardless of the circumstances.  CHIEF OF
> POLICE MACE MCINTOSH was one city official
> responsible for maintaining this practice and
> so recited the above practice when explaining
> to SONORA SCHOOL DISTRICT personnel why C.B.
> must be handcuffed.**

> **82) Defendant CITY OF SONORA exhibited
> deliberate indifference to the constitutional
> rights of minors in maintaining such a
> practice, which was contrary to their written
> policy.  Defendant CITY OF SONORA knew or
> should have known that maintaining such a
> practice was in violation of well-established
> constitutional rights of minors to be treated
> with special care by police officers.  The
> City's policy, practice, rule or regulation
> did directly result in the violation of
> Plaintiff's constitutional rights.**

24

83) The acts of Defendants, as alleged
herein, were malicious and oppressive and
justify the imposition of damages against the
CITY OF SONORA under *Monell* as well as the
imposition of substantial exemplary damages
against the CITY OF SONORA.

Local government entities and local government officials acting in their official capacity can be sued for monetary, declaratory, or injunctive relief, but only if the allegedly unconstitutional actions took place pursuant to some "policy statement, ordinance, or decision officially adopted and promulgated by that body's officers...." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978). Alternatively, if no formal policy exists, plaintiffs may point to "customs and usages" of the local government entity. *Id*. A local government entity cannot be held liable simply because it <u>employs</u> someone who has acted unlawfully. *Id*. at 694. *See also Haugen,* 351 F.3d at 393 ("Municipalities cannot be held liable under a traditional respondeat superior theory. Rather, they may be held liable only when "action pursuant to official municipal policy of some nature caused a constitutional tort.... [T]o establish municipal liability, a plaintiff must prove the existence of an unconstitutional municipal policy.").

To prevail in a civil rights claim against a local government under *Monell*, a plaintiff must satisfy a three-part test:

(1) The local government official(s) must have
intentionally violated the plaintiff's constitutional
rights;

> (2)   The violation must be a part of policy or custom and may not be an isolated incident; and
>
> (3)   There must be a link between the specific policy or custom to the plaintiff's injury.

*Id.* at 690-92.   There are a number of ways to prove a policy or custom of a municipality.   A plaintiff may show (1) "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "the official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). The Ninth Circuit has held that a municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded."   Id.

A municipality may still be liable under *Monell* for a single incident where: (1) the person causing the violation has "final policymaking authority;" (2) the "final policymaker" "ratified" a subordinate's actions; or (3) the "final policymaker" acted with deliberate indifference to a subordinate's constitutional violations.   *Christie v. Iopa*, 176 F.3d 1231 (9th Cir. 1999).

While Plaintiff concedes that written Handcuffing Policy does not state that all detainees must be handcuffed, the FAC alleges that the Chief of Police maintained a practice and custom

26

of ignoring the written policy and requiring all detainees, regardless of the circumstances, to be handcuffed.  Plaintiff cites *Rendon v. City of Fresno*, 2007 WL 2302340 at *4 (E.D.Cal., Aug. 8, 2007):

> A local government entity cannot be held liable under § 1983 simply because it employs someone who acted unlawfully.  Instead, it is when 'execution of a government's policy or custom, whether made by its law-makers or by those whose edicts or acts may fairly be said to represent official policy,' inflicts the injury that the government as an entity is responsible.  *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984 (9th Cir.2002) (quoting *Monell*, 436 U.S. at 694)).  'A single decision by a municipal policymaker may be sufficient to trigger section 1983 liability under *Monell*, even though the decision is not intended to govern future situations.'  *Haughn v. Brosseau*, 351 F.3d 372 (9th Cir.2003) (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir.1992) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 ... (1986)).  The local government will be found responsible if it can be established that 'the individual who committed the constitutional tort was an official with final policymaking authority and that the challenged action itself was an act of official governmental policy.'  *Sepatis v. City & County of San Francisco*, 217 F.Supp.2d 992, 1005 (D.Cal.2002).

Defendant City of Sonora's motion to dismiss the Ninth Cause of Action is DENIED.  The allegations of the FAC suffice to state a claim for *Monell* liability.  Whether Plaintiff can prove *Monell* liability depends on the facts, which must be resolved at summary judgment or trial.

       4.   <u>Second Cause of Action for False Imprisonment</u>.

Defendants move to dismiss the Second Cause of Action for

false imprisonment for failure to state a claim upon which relief can be granted.

"The elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief." *Easton v. Sutter Coast Hosp.*, 80 Cal.App.4th 485, 496 (2000). Defendants contend that dismissal is required because "the officers were acting reasonably and with lawful privilege of protecting the public peace and order and are immune from suit." Defendants cite *Billington v. Smith*, 292 F.3d 1177, 1188-1189 (9th Cir.2002), a case involving deadly force under Section 1983, that "even though the officers might have had 'less intrusive means available to them,' and perhaps under departmental guidelines should have 'developed a tactical plan' instead of attempting an immediate seizure, police officers 'need not avail themselves of the least intrusive means of responding' and need only act 'within that range of conduct we identify as reasonable.'" Defendants cite *Knapps v. City of Oakland*, 647 F.Supp.2d 1129, 1166 (N.D.Cal.2009):

> Although the amount of force Officer Cardoza used excessive, Plaintiff has not shown that it is improper for officers to handcuff a battery suspect. The use of handcuffs can typically be justified on safety concerns.

Defendants assert that they are entitled to immunity pursuant to California Government Code § 821.6, which provides that a public employee is immune from liability for injuries caused by instituting or prosecuting any judicial or administrative proceedings, even if the

employee acts maliciously and without probable cause.

Whether Defendants were acting reasonably and with lawful privilege is a question of fact which cannot be resolved in a motion to dismiss.  In addition, California denies immunity to police officers who use excessive force in arresting a suspect. *Robinson v. Solano County*, 278 F.3d 1007, 1016 (9th Cir.2002), citing *Mary M. v. City of Los Angeles*, 54 Cal.3d 202, 215 (1991). Public employees are not entitled to immunity in suits for false arrest or false imprisonment.  *Id.*, citing California Government Code § 820.4.  Because the Defendant Officers may not be entitled to immunity, the City of Sonora is not entitled to immunity. *Id.*, citing California Government Code § 815.2.  Defendants reference to Section 821.6 makes no sense in the context of this action because the FAC does not allege that Defendants instituted or prosecuted any judicial or administrative proceedings.

Defendants' motion to dismiss the Second Cause of Action for false imprisonment is DENIED.

### 5.  Third Cause of Action for Battery.

Defendants move to dismiss the Third Cause of Action for battery for failure to state a claim upon which relief can be granted.

As explained in *Brown v. Ransweiler*, 171 Cal.App.4th 516, 526-527 (2009):

> The elements of civil battery are: (1) defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the

harmful or offensive contact caused injury,
damage, loss or harm to plaintiff ....

An officer '"may use reasonable force to make
an arrest, prevent escape or overcome
resistance, and need not desist in the face
of resistence."' ... '"Unlike private
citizens, police officers act under color of
law to protect the public interest.  They are
charged with acting affirmatively and using
force as part of their duties, because 'the
right to make an arrest or investigatory stop
necessarily carries with it the right to use
some degree of physical coercion or threat
thereof to effect it.' ..."' ... '"[Police
officers] are, in short, not similarly
situated to the ordinary battery defendant
and need not be treated the same.  In these
cases, then, ' ... the defendant police
officer is in the exercise of the privilege
of protecting the public peace and order
[and] he is entitled to the even greater use
of force than might be in the same
circumstances required for self-defense.'
..."' ....

A state law battery claim is a counterpart to
a federal claim of excessive use of force.
In both, a plaintiff must prove that the
peace officer's use of force was
unreasonable.

Defendants reiterate that the officers, in good faith, acted

in an objectively reasonable manner and, therefore, the Third

Cause of Action should be dismissed.  Defendants refer to the

allegations that the City of Sonora has a written handcuff

policy, which is a discretionary procedure and that the officers

only arrived at the school based on information from school

officials, including a specialist, that Plaintiff was out of

control.  Defendants argue:

Restraining a minor plaintiff, who had been
reportedly 'out of control' before they
arrived, pursuant to a discretionary policy

1
2

                **vesting them with the power to do so, and
delivering the minor to a relative's home is
clearly not unreasonable.**

3
4
5
6

     **For the reasons already stated, Defendants' contentions
raise factual issues, especially given the allegation that the
Chief of Police stated that he was handcuffing Plaintiff because
of protocol and not because of any concern for safety or flight.**

7
8
9

     **Defendants rely on California Government Code § 820.2 in
arguing that Defendants are entitled to immunity.   Section 820.2
provides:**

10
11
12
13

                **Except as otherwise provided by statute, a
public employee is not liable for an injury
resulting from his act or omission where the
act or omission was the result of the
exercise of the discretion vested in him,
whether or not such discretion be abused.**

14
15
16
17
18

**Defendants, relying on Section 820.2, move to dismiss the Third
Cause of Action on the ground that government officials are not
personally liable for their discretionary acts within the scope
of their authority, even where it is alleged that their conduct
was malicious.**

19
20
21

     **In *Caldwell v. Montoya*, 10 Cal.4th 972 (1995), the
California Supreme Court, citing *Johnson v. State*, 69 Cal.2d 782
(1968), ruled:**

22
23
24
25
26

                **... *Johnson* concluded, a 'workable
definition' of immune discretionary acts
draws the line between 'planning' and
'operational' functions of government.
(*Johnson, supra,* 69 Cal.2d at pp. 793, 794.)
Immunity is reserved for those '*basic policy
decisions* [which have] ... been [expressly]
committed to coordinate branches of
government,' and as to which judicial
interference would thus be 'unseemly.'   (*Id.***

at p. 793 ....)  Such 'areas of quasi-legislative policy-making ... are sufficiently sensitive' (*id.* at p. 794) to call for judicial abstention from interference that 'might even in the first instance affect the coordinate body's decision-making process' (*id.* at p. 793).

On the other hand, said *Johnson*, there is no basis for immunizing lower-level, or 'ministerial,' decisions that merely implement a basic policy already formulated. (*Johnson*, *supra*, 69 Cal.2d at p. 796.) Moreover, we cautioned, immunity applies only to *deliberate and considered* policy decisions, in which a '[conscious] balancing [of] risks and advantages ... took place. The fact that an employee normally engages in "discretionary activity" is irrelevant if, in a given case, the employee did not render a considered decision ....' (*Id.* at p. 795, fn. 8).

Recognizing that 'it is not a tort for government to govern' ..., our subsequent cases have carefully preserved the distinction between policy and operational judgments.  Thus, we have rejected claims of immunity for a bus driver's decision not to intervene in one passenger's violent assault against another ..., a college district's failure to warn of known crime dangers in a student parking lot ..., a county clerk's libelous statements during a newspaper interview about official matters ..., university therapists' failure to warn a patient's homicide victim of the patient's prior threats to kill her ..., and a police officer's negligent conduct of a traffic investigation once undertaken ....

On the other hand, we have concluded that the discretionary act statute does immunize officials and agencies against claims that they unreasonably delayed regulations under which a murdered security guard might have qualified himself to carry a defensive firearm ... or negligently released a violent juvenile offender into his mother's custody.

10 Cal.4th at 981-982.

32

1    Here, the decision to handcuff Plaintiff cannot be viewed as

2  a basic policy decision, but rather it must be viewed as a

3  ministerial decision implementing a basic policy already

4  formulated.

5    Defendants' motion to dismiss the Third Cause of Action for

6  battery is DENIED.

7         6.  <u>Fourth Cause of Action for Intentional Infliction</u>

8  <u>of Emotional Distress</u>.

9    Defendants move to dismiss the Fourth Cause of Action for

10  intentional infliction of emotional distress for failure to state

11  a claim upon which relief can be granted.

12    After incorporating all preceding allegations, the Fourth

13  Cause of Action alleges:

14         51) Defendants HAL PROCK, MACE MCINTOSH and
           the CITY OF SONORA, via respondeat superior
15         liability, engaged in conduct including, but
           not limited to battery and false imprisonment
16         of Plaintiff, a minor with disabilities who
           was susceptible to infliction of emotional
17         distress.

18         52) Defendants' conduct was extreme and
           outrageous, and was intended to cause
19         PLAINTIFF severe emotional distress and/or
           was done in conscious disregard of the
20         possibility of causing such distress.

21         53) Defendants spoke to PLAINTIFF C.B. before
           detaining and handcuffing him and knew that
22         C.B. was calm and cooperative and had obeyed
           Officer Prock's instructions to stand up from
23         the playground bench.  The officers never
           observed Plaintiff C.B. acting agitated in
24         any way during their entire contact with
           Plaintiff C.B.  Defendants knew that the
25         Sonora Police Department's Handcuff Policy
           counseled against handcuffing C.B. as he was
26         under the age of 14 and in a clam [sic] state

                               33

> of mind.  Officer Prock admitted to C.B. in
> the ride to Jamestown, California that he had
> been a police officer for eleven years and
> never had to handcuff an eleven year old for
> doing nothing.  The officers knew that how
> they were treating the calm and cooperative
> eleven year old Plaintiff C.B. was wrong and
> excessive.

Under California law, the elements of a claim for intentional infliction of emotional distress are: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct.  *Hergenroeder v. Travelers Property Cas. Ins. Co.,* 249 F.R.D. 595, 620 (E.D.Cal.2008).  Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community.  *Id.*

Defendants argue that the FAC does not allege extreme or outrageous conduct:

> These officers ensured the safety of a child
> who they were informed was 'out of control'
> and 'disruptive.'  The only alleged conduct
> of the officers is that plaintiff was
> handcuffed and placed in a police vehicle.

Defendants further argue that the FAC does not allege severe emotional distress.  "Severe emotional distress means '"emotional distress of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it.'""  *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th

965, 1004 (1993).    Defendants argue:

> Plaintiff was handcuffed and driven in a
> police car for approximately half of an hour
> and released to his uncle.  This does not
> constitute emotional distress that a
> reasonable person in a civilized society
> should not be expected to endure.

As discussed above, it is questionable that Defendants handcuffed Plaintiff for his own safety.  The allegations of the FAC are that Plaintiff was handcuffed at the direction of the Chief of Police pursuant to a protocol, which is not supported by the alleged written Handcuffing Policy.  Further, the allegations are that Defendants ignored Plaintiff's IEP after they were advised of it and instead of contacting family members to come to the school, removed Plaintiff from the school in a police vehicle.  Whether this conduct is "outrageous" and caused "severe emotional distress" is a question of fact.  The Fourth Cause of Action sufficiently alleges a claim of intentional infliction of emotional distress.

Defendants also move to dismiss the Fourth Cause of Action on the ground that the officers are immune from liability pursuant to California Government Code §§ 821.6 and 820.2. Defendants cite *Kemmerer v. County of Fresno,* 200 Cal.App.3d 1426 (1988).  In *Kemmerer*, a civil service employee brought suit against the county and individual county officials based on disciplinary proceedings instituted against him and his discharge arising out of those proceedings.  One of the causes of action was for intentional infliction of emotional distress.  In finding

immunity under Section 820.2, the *Kemmerer* Court held:

> We have no doubt that this analysis leads inevitably to the conclusion in the case at bench that the decision of Kelley and Velasquez to institute disciplinary proceedings against Kemmerer was a policy decision involving the exercise of discretion entitling them to immunity under Government Code section 820.2.  The decision whether or not to initiate discipline proceedings and what discipline to impose is placed initially on the department head and the decision is entirely within his discretion.  The decision involves the exercise of analysis and judgment as to what is just and proper under the circumstances and is not purely a ministerial act.

*Kemmerer*, 200 Cal.App.3d at 1437.

However, as discussed above, the California Supreme Court's decision in *Caldwell v. Montoya* appears to apply a different standard than that applied in *Kemmerer*.  Defendants' decision to handcuff Plaintiff and take him to his uncle in a police car cannot be viewed as a basic policy decision, but rather it must be viewed as a ministerial decision implementing a basic policy already formulated.   Defendants reference to Section 821.6 makes no sense in the context of this action because the FAC does not allege that Defendants instituted or prosecuted any judicial or administrative proceedings.

Defendants motion to dismiss the Fourth Cause of Action is DENIED.

7.   <u>Punitive Damages</u>.

The FAC prays for exemplary damages against the City of Sonora on each of the causes of action alleged against the City.

36

Although not asserted by Defendants as a ground for dismissal of the FAC, a municipality entity is immune from punitive damages under Section 1983. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 271 (1981). California Government Code § 818 provides:

> Notwithstanding any other provision of law, a
> public entity is not liable for damages
> awarded under Section 3294 of the Civil Code
> or other damages imposed primarily for the
> sake of example and by way of punishing the
> defendant.

Because Defendants did not move for dismissal of the prayers for punitive damages against the City, the Court does not dismiss these allegations *sua sponte*. However, Plaintiff is advised to revise the requested relief in his scheduling and pretrial statements.

        C. <u>Motion for More Definite Statement</u>.

            1. <u>Governing Standards</u>.

    "Under the liberal pleading standards, 'pleadings in federal courts are only required to fairly notify the opposing party of the nature of the claim.'" *City of South Pasadena v. Slater*, 56 F.Supp.2d 1095, 1105 (C.D. Cal. 1999). Federal Rule of Civil Procedure 12(e) provides:

> If a pleading to which a responsive pleading
> is permitted is so vague or ambiguous that a
> party cannot reasonably be required to frame
> a responsive pleading, the party may move for
> a more definite statement before interposing
> a responsive pleading. The motion shall
> point out the defects complained of and the
> details desired. If the motion is granted
> and the order of the court is not obeyed
> within 10 days after notice of the order or
> within such other time as the court may fix,
> the court may strike the pleading to which

the motion was directed or make such order as
it deems just.

A Rule 12(e) motion for a more definite statement must be
considered in light of Rule 8's liberal pleading standards in
federal court.  *See, e.g.*, *Bureerong v. Uvawas*, 922 F.Supp 1450,
1461 (C.D. Cal. 1996).

A Rule 12(e) motion is proper only if the complaint is so
indefinite that the defendant cannot ascertain the nature of the
claim being asserted, *i.e.*, so vague that the defendant cannot
begin to frame a response.  *See Famolare, Inc. v. Edison Bros.
Stores, Inc.*, 525 F.Supp. 940, 949 (E.D. Cal. 1981).  The Court
must deny the motion if the complaint is specific enough to
notify defendant of the substance of the claim being asserted.
*See Bureerong*, 922 F.Supp. at 1461; *see also San Bernardino Pub.
Employees Ass'n v. Stout*, 946 F.Supp. 790, 804 (C.D. Cal. 1996)
("A motion for a more definite statement is used to attack
unintelligibility, not mere lack of detail, and a complaint is
sufficient if it is specific enough to apprise the defendant of
the substance of the claim asserted against him or her.").

The Court may also deny the motion if the detail sought by a
motion for more definite statement is obtainable through
discovery.  *See Davidson v. Santa Barbara High Sch. Dist.*, 48
F.Supp.2d 1225, 1227 (C.D. Cal. 1998).  "Thus, the class of
pleadings that are appropriate subjects for a motion under Rule
12(e) is quite small—the pleading must be sufficiently
intelligible for the court to be able to make out one or more

38

potentially viable legal theories on which the claimant might proceed, but it must not be so vague or ambiguous that the opposing party cannot respond, even with a simple denial, in good faith or without prejudice to himself."   Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* (2d ed.) §1376.

Whether to grant a Rule 12(e) motion for a more definite statement lies within the wide discretion of the district court. *See id.* §1377.  However, "[m]otions for more definite statement are viewed with disfavor, and are rarely granted."  William W. Schwarzer, A. Wallace Tashima, and James M. Wagstaffe, Federal Civil Procedure Before Trial §9:351 (2000).

2.  <u>Merits of Motion</u>.

Defendants move for a more definite statement, asserting that the FAC alleges that Defendants were malicious, oppressive, fraudulent and acted in bad faith, but sets forth no specific facts to support these allegations, thereby necessitating a more definite statement.  Defendants rely on *Crawford-El v. Britton*, 523 U.S. 574 (1998).

In *Crawford-El*, the Supreme Court held that a plaintiff bringing a constitutional action against government officials for damages, for which an official's improper motive is a necessary element, need not adduce clear and convincing evidence of improper motive in order to defeat an official's motion for summary judgment.  The Supreme Court then stated:

> Though we have rejected the Court of Appeals'
> solution, we are aware of the potential
> problem that troubled the court.  It is

39

therefore appropriate to add a few words on some of the existing procedures available to federal trial judges in handling claims that involve examination of an official's state of mind.

When a plaintiff files a complaint against a public official alleging a claim that requires proof of wrongful motive, the trial court must exercise its discretion in a way that protects the substance of the qualified immunity defense.  It must exercise its discretion so that officials are not subjected to unnecessary and burdensome discovery or trial proceedings.  The district judge has two primary options prior to permitting any discovery at all.  First, the court may order a reply to the defendant's or a third party's answer under Federal Rule of Civil Procedure 7(a), or grant the defendant's motion for a more definite statement under Rule 12(e).  Thus, the court may insist that a plaintiff 'put forward specific, nonconclusory factual allegations' that establish improper motive causing cognizable injury in order to survive a prediscovery motion for dismissal or summary judgment ... This option exists even if the official chooses not to plead the affirmative defense of qualified immunity.  Second, if the defendant does plead the immunity defense, the district court should resolve that threshold question before permitting discovery ... To do so, the court must determine whether, assuming the truth of the plaintiff's allegations, the official's conduct violated clearly established law.  Because the former option of demanding more specific allegations of intent places no burden on the defendant-official, the district judge may choose that alternative before resolving the immunity question, which sometimes requires complicated analysis of legal issues.

523 U.S. at 597-598.

Plaintiff responds that the standard for the alleged Fourth Amendment violations is one of objective reasonableness.  See

40

discussion supra.  Therefore, a more definite statement is not required.

     Given the standards set forth above, Defendants' motion for more definite statement is DENIED.

                              **CONCLUSION**

     For the reasons stated:

     1.  Defendants' motion to dismiss the First Amended Complaint and for more definite statement is DENIED;

     2.  Plaintiff's counsel shall prepare and lodge a form of order consistent with this Memorandum Decision within five (5) court days following service of this Memorandum Decision.

     IT IS SO ORDERED.

Dated:   **March 8, 2010**                    _____**/s/ Oliver W. Wanger**_____
                                             UNITED STATES DISTRICT JUDGE